537 F.2d 787
 The NORTH CAROLINA UTILITIES COMMISSION, Petitioner,
Southeastern Association of Regulatory Utility
Commission, Intervenor,
v.
The FEDERAL COMMUNICATIONS COMMISSION and the United States
of America, Respondents, International Telephone
and Telegraph Communications, et al.,
Intervenors.
CAROLINA TELEPHONE AND TELEGRAPH COMPANY and United
Telephone Company of theCarolinas, Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America,Respondent, National Retail Merchants
Association, Inc., and the North
AmericaTelephone Association,
Intervenors.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY and Associated Bell
System Companies, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America,Respondents, National Retail Merchants
Association, et al., Inc., Intervenors.
NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
and
Southern Pacific Communications Company et al., Intervenors.
UNITED STATES INDEPENDENT TELEPHONE ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION, and United States of
America, Respondents,
and
Southern Pacific Communications Company et al., Intervenors.
CONTINENTAL TELEPHONE CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,MCI Telecommunications Corp.,
et al., Intervenors.
 Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 22, 1975.
Decided April 14, 1976.
 
 Edward B. Hipp, Raleigh, N.C. (Maurice W. Horne and Jerry B. Fruitt, Raleigh, N.C., on brief), for petitioner North Carolina Utilities Commission in No. 74--1220.
 Carl E. Sanders, Augusta, Ga., and (Norman L. Underwood, Atlanta, Ga., on brief), for intervenor Southeastern Ass'n of Regulatory Utility Com'rs in No. 74--1220.
 Thomas J. O'Reilly, Washington, D.C. (Chadbourne, Parke, Whiteside & Wolff, Washington, D.C., on brief), for petitioner U.S. Independent Tel. Ass'n in No. 74--1515.
 Warren E. Baker, Westwood, Kan., Richard J. Croker, Kansas City, Mo., and Carolyn C. Hill, Washington, D.C., on brief, for petitioners Carolina Tel. & Tel. Co. and United Tel. Co. of the Carolinas, Inc. in No. 74--1390.
 George D. Gibson, John W. Riely, Richmond, Va., John H. Shenefield, Washington, D.C., Gary V. McGowan, Richmond, Va., F. Mark Garlinghouse, Harold J. Cohen, New York City, charles Ryan, Alfred C. Partoll, New York City, Richard Partricdge, Albuquerque, N.M., Hunton, Williams, Gay & Gibson, Washington, D.C., on brief, for petitioners The Bell System Companies in No. 74--1449.
 Irwin Schneiderman, New York City, Donald J. Mulvihill, Washington, D.C., Laurence T. Sorkin, Joel C. Balsam, Michael J. Klosk, Cahill, Gordon & Reindel, New York City, on brief, for petitioner Continental Tel. Corp. in No. 74--1516.
 Joseph A. Marino, Associate Gen. Counsel, U.S. Dept. of Justice, Washington, D.C. (Thomas E. Kauper, Asst. Atty. Gen., Washington, D.C., Seymour H. Dussman, Atty., Ashton R. Hardy, Gen. Counsel, John E. Ingle, Counsel, U.S. Dept. of Justice, Washington, D.C., on brief), for respondent F.C.C. in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515, and 74--1516.
 Edwin B. Spievack, (Victor J. Toth, Cohn & Marks, Keller & Heckman, Washington, D.C., on brief), for intervenors Telerent Leasing Corp., North American Tel. Ass'n, and others, in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Charles R. Cutler, Washington, D.C. (John L. Bartlett, John B. Wyss, Kirkland, Ellis & Rowe, Washington, D.C., on brief), for intervenors Aeronautical Radio, Inc. in Nos. 74--1220, 74--1390, 74--1449, 74-1514, 74--1515 and 74--1516.
 James E. Landry, Washington, D.C., on brief, for intervenors Air Transport Ass'n of America in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 David Anderson (J. Roger Wollenberg, William T. Lake, Neil J. King, Neal M. Goldberg, Wilmer, Cutler & Pickering, Washington, D.C., J. Gordon Walter, New York City, on brief), for intervenor International Business Machines Corp. (IBM) in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Kevin H. Cassidy, James T. Roche, and John M. Scorce, Vienna, Va., on brief, for intervenor Data Transmission Co. in No. 74--1220.
 William H. Borghesani, Jr., Keller & Heckman, Washington, D.C., on brief, for intervenor National Retail Merchants Ass'n, Inc. in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Joseph M. Kittner, Edward P. Taptich, McKenna, Wilkinson & Kittner, John S. Voorhees, Howrey, Simon, Baker & Murchison, Washington, D.C., on brief, for intervenor-respondent Computer and Business Equipment Manufacturers Ass'n (CBEMA) in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Charles M. Meehan, Washington, D.C., on brief, for intervenor Utilities Telecommunications Council in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Robert E. McKee, New York City, David M. Clark, Clark, Tanner & Williams, Greensboro, N.C., on brief, for intervenor International Tel. & Tel. Corp. in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Herbert E. Marks, Stephen R. Bell, Wilkinson, Cargun & Barker, Washington, D.C., on brief, for intervenor Remote Processing Services Section of Ass'n of Data Processing Service Organizations, Inc. in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Joseph E. Keller, Wayne V. Black, Keller & Heckman, Washington, D.C., on brief for intervenor Central Committee on Telecommunications of American Petroleum Institute in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Michael H. Bader, Washington, D.C., Kenneth A. Cox, William J. Byrnes, John Wells King, haley, Bader & Potts, Washington, D.C., on brief, for intervenor MCI Telecommunications Corp. in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Herbert E. Forrest, Steptoe & Johnson, Thormund A. Miller and Richard S. Kopf, Washington, D.C., on brief for intervenor Southern Pacific Communications Co. in Nos. 74--1220, 74--1390, 74--1449, 74--1514, 74--1515 and 74--1516.
 Before HASTIE* and TUTTLE**, Senior Circuit Judges, and WIDENER, Circuit Judge.
 HASTIE, Senior Circuit Judge.
 
 
 1
 This controversy began with a petition in which several manufacturers and distributors of communications equipment asked the Federal Communications Commission (hereinafter, FCC or the Commission) to rule that state regulatory agencies are precluded from restricting or regulating the interconnection of customer-provided equipment to the customer's individual subscriber station and line in any way that conflicts with the Commission's regulation of the same subject matter. The petition recited that the North Carolina Utilities Commission had given public notice of a proposed rule to prohibit such connection of customer-provided equipment in that state, except for use exclusively with facilities separate from those used in intrastate communication.[1] It also was alleged that the Attorney General of Nebraska had advised the Nebraska Public Service Commission that rulings of FCC did not control the attachment of customer-provided equipment to telephone facilities used for intrastate communication. The same opinion stated that approval of the state regulatory authority was necessary before a motel could lawfully connect its own internal communications equipment to its telephone subscriber station.
 
 
 2
 In these circumstances the Commission utilized the proceedings on the equipment manufacturers' petitions to provide the industry, concerned state agencies and the public with a definitive declaratory ruling[2] on the extent to which it asserts and is exercising primary authority, upon which state agencies may not encroach, over the terms and conditions that govern the interconnection of customer-provided equipment to the subscriber's telephone terminal. After adequate notice and consideration of written or oral submissions by some 46 interested parties, the Commission issued the order that is now here for review.[3] In the Matter of Telerant Leasing Corp., et al., 1974, 45 F.C.C.2d 204.
 
 
 3
 As the agency established by the Communications Act of 1934, 47 U.S.C. § 151, to administer the provisions of that statute, the Federal Communications Commission is empowered, in the language of section 1 of the Act,[4] to regulate interstate and foreign commerce in communication by wire and radio 'so as to make available . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . ..' By comprehensive definition of 'communication by wire', section 3 makes it explicit that the subject matter of the Commission's jurisdiction includes 'all instrumentalities, facilities, apparatus, and services . . . incidental to . . . (interstate) transmission' by wire.
 
 
 4
 On the other hand, section 2 both restates the applicability of the Act to 'all interstate and foreign communications by wire or radio' and specifies that it shall not 'be construed to apply to or give the Commission jurisdiction with respect to '(b)(1)' . . . facilities, or regulations for or in connection with intrastate communication service . . . of any carrier . . ..'
 
 
 5
 Terminal equipment that is connected to a telephone subscriber's station and line does in fact connect with the national telephone network. Usually it is not feasible, as a matter of economics and practicality of operation, to limit the use of such equipment to either interstate or intrastate transmissions. In paragraph 26 of the decision from which these appeals have been taken, the Commission has described the underlying realities as follows:
 
 
 6
 '. . . exchange plant, particularly subscriber stations and lines, is used in common and indivisibly for all local and long distance telephone calls. There is no interstate message toll telephone service either offered or practically possible except over exchange plant used for both intrastate and interstate and foreign service'. 45 F.C.C.2d 204, 215.
 
 
 7
 Although some appellants have expressed disagreement with this finding, we find no basis for challenging it.
 
 
 8
 It follows that the Commission's present assertion of jurisdiction over the interconnection of customer provided equipment to the nation-wide network unavoidably affects intrastate as well as interstate communication. And, by the same token, both would be restricted by any state action that prevented such interconnection. Thus, the language of sections 1 and 2 that both grants the Commission authority to regulate facilities of interstate communication and withholds authority to regulate facilities of intrastate communication creates the present dispute but, considered alone, does not resolve it.
 
 
 9
 In these circumstances it is relevant and helpful to consider other provisions of the Communications Act. By force of a heretofore unmentioned concluding clause of section 2(b), not only telephone companies with lines that extend interstate but also those local companies that provide interstate service solely through connection with the lines of telephone companies that are unrelated to them, are expressly made amenable to the regulatory provisions of sections 201 through 205 of the Act. All of the telephone companies parties to this suit are thus integrated into the national network and subject to the provisions of sections 201 through 205. More particularly, under section 201, charges and practices for and inconnection connection with interstate service must 'be just and reasonable'. Section 202 makes unlawful any 'unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services . . ..' Section 203 requires carriers to file with the Commission their tariff schedules for interstate communication service 'showing the classifications, practices, and regulations affecting such charges'. Sections 204 and 205 prescribe the manner in which the Commission shall administer and implement the requirements of the preceding sections, approving or invalidating tariffs as may be appropriate. It is in connection with the Commission's efforts to discharge its responsibilities under sections 201 through 205 and the alleged frustrating effect of countervailing state action that this controversy about jurisdiction over the attachment of customer-provided equipment has arisen.
 
 
 10
 Historically, a telephone company's restrictions, requirements and other regulations concerning customer provided equipment have been published and effectuated through inclusion in interstate tariffs. Some years ago, tariffs published by American Telephone and Telegraph Co. (hereinafter AT&T), acting for itself and other concurring carriers throughout the nation, forbade the subscriber to connect to his line any device or equipment not furnished by the telephone company. As defendant in a consequent anti-trust suit by a manufacturer of a terminal device, AT&T successfully urged that the suit was premature because of the primary jurisdiction of FCC over the question of the lawfulness of the inclusion of this restriction in the controlling tariff.[5] This led to a formal FCC proceeding for determination whether the tariff contained any unreasonable or unlawfully discriminatory restriction.
 
 
 11
 In its ensuing decision the Commission held that the tariff's blanket and unqualified prohibition of the interconnection of customer provided equipment was unreasonable and unjustifiably discriminatory, hence invalid under sections 201 and 202 of the Act. Carterfone v. AT&T, 1968, 13 F.C.C.2d 420, reconsideration denied, 14 F.C.C.2d 571. At the same time the telephone companies were authorized, without any particularizing directive, to file new tariffs regulating the use of customer-provided equipment. They did so, and the Commission reviewed the tariffs and permitted them to become effective. See In the Matter of AT&T 'Foreign Attachment' Tariff Revisions, 1968, 15 F.C.C.2d 605, reconsideration denied, 18 F.C.C.2d 871.
 
 
 12
 The coverage of one of the approved new tariffs, F.C.C. No. 263, which, as subsequently amended, remains in effect, is relevant to the present dispute. It authorizes and regulates the connection and use of customer-provided terminal equipment with telephone company facilities for long distance message communication. It covers both data and voice transmitting and receiving terminal equipment, as well as mechanically attached accessories. Provision also is made for the connection of customer-provided communications systems with the interstate telephone network. At the same time, various safeguards are required. Thus, with few exceptions, the tariff provides that access to the telephone network must be through a telephone company supplied network control signalling unit, which serves as a protective interface. Far from surrendering jurisdiction over alternative means of access, the Commission postponed, pending further engineering and technical study, decision whether and what customer-provided signalling devices should be approved.
 
 
 13
 If, as North Carolina is formally proposing and the Attorney General of Nebraska has held to be permissible, state jurisdiction over intrastate communication facilities is exercised in a way that, in practical effect, either prohibits customer-supplied attachments authorized by tariff F.C.C. No. 263 or restricts their use contrary to the provisions of that or any other interstate tariff, the Commission will be frustrated in the exercise of that plenary jurisdiction over the rendition of interstate and foreign communication services that the Act has conferred upon it. The Commission must remain free to determine what terminal equipment can safely and advantageously be interconnected with the interstate communications network and how this shall be done.
 
 
 14
 We have no doubt that the provisions of section 2(b) deprive the Commission of regulatory power over local services, facilities and disputes that in their nature and effect are separable from and do not substantially affect the conduct or development of interstate communications. But beyond that, we are not persuaded that section 2(b) sanctions any state regulation, formally restrictive only of intrastate communication, that in effect encroaches substantially upon the Commission's authority under sections 201 through 205.[6] In this view of the interrelation of the provisions of the Act, the Commission's declaratory statement of its primary authority over the interconnection of terminal equipment with the national telephone network is a proper and reasonable assertion of jurisdiction conferred by the Act. Cf. G.T.E. Service Corp. v. F.C.C., 2d Cir. 1973, 474 F.2d 724, approving an FCC ruling that prohibited telephone companies, including those that engaged primarily in local exchange service and participated in interstate service only through connection with other unrelated carriers, from engaging in the data processing business.
 
 
 15
 We are all the more confident of this because, elsewhere in the Act itself, Congress has recognized the existence of areas of common national and state concern and has provided a procedure under which national primacy is recognized, yet the Commission is authorized to receive and consider information, views and proposals from concerned state agencies that may aid it in reaching informed and wise decisions. More particularly, section 410(c) of the Act confers upon the Commission discretionary power to refer any matter 'relating to common carrier communications of joint Federal-State concern, to a Federal-State Joint Board' of four state and three federal Commissioners for examination and for preparation of a recommended FCC decision. It even is required that the state members of a Joint Board shall participate, without vote, in the Commission's consideration of the Board's recommendation. We find it very difficult to square this Congressional design with the present contention that section 2(b) is intended to deprive the Commission of jurisdiction over the use of facilities that necessarily serve both interstate and intrastate communications. We think the Commission has acted properly in this case by resolving the challenge to its jurisdiction and at the same time proceeding separately, as it has,[7] to utilize the Joint Board procedure as an aid to sound resolution of interconnection problems that emerge in this period of developing technology and increasing demand.
 
 
 16
 It also is significant that for many years FCC, rejecting the argument that section 2(b)(1) deprives it of control over terminal facilities and equipment used in connection with both interstate and intrastate communications, has repeatedly exercised such jurisdiction. As early as 1947, FCC directed telephone companies to file tariff regulations that would permit the connection of recording devices to telephone receivers under specified conditions. Use of Recording Devices, 11 F.C.C. 1033. For present purposes the significant circumstance is that in its opinion the Commission discussed and rejected a contention of the Bell Systems that 'facilities which are used for interstate and intrastate services are excluded from the Commission's jurisdiction as 'facilities . . . for or in connection with intrastate communication', as that term is used in Section 2(b)(1) of the Communications Act'. 11 F.C.C. at 1046. A subsequent opinion pointed out that '(w)ere the Commission to exercise its jurisdiction only where the telephone facilities in question were exclusively interstate in character, it would result in virtually complete abdication from the field of telephone regulation . . ..' Katz v. A.T.&.T., 1953, 43 F.C.C. 1328, 1332, 8 Pike & Fischer Radio Reg. 919, 923.
 
 
 17
 More recent decisions also regulate terminal facilities or attachments used in both intrastate and interstate commerce. E.g., United States Department of Defense v. General Telephone Co., 1973, 38 F.C.C.2d 803, aff'd F.C.C. No. 73--854; AT&T--TWX, 1965, 38 F.C.C. 1127, 1133; AT&T--Railroad Interconnections, 1962, 32 F.C.C. 337; Hush-A-Phone Corp. v. AT&T, 1957, 22 F.C.C. 112.
 
 
 18
 Congress cannot have been unaware that for some 30 years FCC has viewed and treated section 2(b)(1) of the Act as imposing no bar to its exercise of jurisdiction over facilities used in connection with both intrastate and interstate telephone communications. Significantly, it was as recently as 1971 that Congress amended the Act by adding the present section 410(c)[8] with its discretionary Joint Federal-State Board procedure that already has been discussed. We think it likely that Congress would have taken quite different action to restrict the Commission's jurisdiction and assure state primacy if, in its view, the Commission had long and repeatedly been exceeding its jurisdiction and impinging upon an area which Congress had intended for exclusive state control.[9]
 
 
 19
 One additional contention merits brief discussion.[10] Some of the petitioners argue that the Commission's action in this case violates a jurisdictional limitation imposed by section 221 of the Act which provides in part:
 
 
 20
 '(b) . . . (N)othing in this Act shall be construed . . . to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire . . . exchange service, . . . even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority.'
 
 
 21
 For present purposes it suffices to point out that the legislative history indicates that this restriction is intended to do no more than to prevent the circumstance that a single telephone exchange serves an area that includes parts of more than one state from enlarging the jurisdiction of FCC over the business and facilities of that exchange.[11] To put the matter affirmatively, by force of section 221(b) a local carrier that serves a single multi-state exchange area is assured whatever degree of freedom from federal regulation section 2(b) provides for uni-state carriers and intrastate telephone business generally.
 
 
 22
 In sum, all of the foregoing considerations make appropriate for this case Judge (now Chief Justice) Burger's admonition that the communications 'Act must be construed in light of the needs for comprehensive regulation and the practical difficulties inhering in state by state regulation of parts of an organic whole'. General Telephone Co. of California v. F.C.C., 1969, 134 U.S.App.D.C. 116, 413 F.2d 390, 398, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163.
 
 
 23
 The Commission's Memorandum Opinion and Declaratory Order are sustained as reasonable administrative action within its statutory jurisdiction.
 
 
 24
 WIDENER, Circuit Judge (concurring and dissenting):
 
 
 25
 I respectfully dissent from that part of the court's opinion which determines that the FCC has primary jurisdiction over the interconnection of customer-provided equipment to the subscriber's telephone terminal. Should the statutory jurisdictional hurdle be overcome, I would concur in the balance of the opinion.
 
 
 26
 During the hearings before the House Committee on Interstate and Foreign Commerce and the Senate Committee on Interstate Commerce, it was repeatedly pointed out that § 221(b), 47 U.S.C. § 221(b), was included in order to protect the jurisdiction of the States over intrastate telephone communications. This section, an intentional subtraction from the then existing power of the Interstate Commerce Commission, was designed to overcome the effects of the Shreveport rate case, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), so far as telephone communications were concerned. See Statement of Dr. Irvin Stewart, member of the interdepartmental committee on communications, Hearings on H.R. 8301 Before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 12, 16--18 (1934) (hereinafter House Hearings); statement of F. B. MacKinnon, President of the United States Independent Telephone Association, House Hearings 248; statement of K. F. Clardy, Chairman of the Legislative Committee of the National Association of Railroad and Utilities Commissioners, House Hearings 74; statement of Andrew R. McDonald, National Association of Railroad and Utilities Commissioners, Hearings on S. 2910 Before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. 156 (1934) (hereinafter Senate Hearings).
 
 
 27
 Congress was well aware that at that time 98% of telephone communications was intrastate. 78 Cong.Rec. 10316 (1934). The FCC states 97% of messages are now intrastate. Telerent, Memo Opinion, p. 11. The House Committee was told the every piece of equipment and every exchange could at any moment be used exclusively, although temporarily, in interstate commerce. See statement of K. F. Clardy, House Hearings 73. This condition is the same today.
 
 
 28
 State regulatory commissions expressed themselves in favor of the Act because they understood it to safeguard the states from usurpation of power by the FCC. See statement of K. F. Clardy, House Hearings 71--72.
 
 
 29
 As Senator Dill, Chairman of the Senate Committee, pointed out in response to Mr. Clardy's statements, 'The reason why the State representatives of the State commissions wanted this language (§ 221(b)) in addition to the language of the Interstate Commerce Act--and that has been hopped on, talked about a great deal here, that we have added some language--is that the interpretation placed upon the language of the Interstate Commerce Act in connection with railroads has gone so far that the State commissions fear that this commission, using the same language--that if the same language is used in the law they might override and interfere with State regulations.' Senate Hearings 154.
 
 
 30
 It was even argued in the Senate Hearings that the bill should be changed to provide for Federal regualtion of all facilities used for interstate communication, in order to correspond with the then existing railroad regulation. See Statement of Edward N. Nockels, Legislative Representative of the American Federation of Labor, Senate Hearings 199. Mr. Nockels pointed out that the Act takes away from Federal regulation a large portion of the existing power of the Interstate Commerce Commission. Despite this argument, the wording of the bill remained unchanged, and the taking away of the then existing jurisdiction of the ICC was effected by § 221(b).
 
 
 31
 In discussing § 221, both the House Report and the Senate Report accompanying S. 3285 state in the same words 'Paragraphs (b), (c), and (d) conform to the recommendations of the State commissions, and will enable those commissions, where authorized to do so, to regulate exchange services in metropolitan areas overlapping State lines.' House Report p. 7, Senate Report p. 5.
 
 
 32
 Senator Dill, Chairman of the Senate Committee on Interstate Commerce, when introducing the bill on the floor of the Senate, pointed out the intent of the bill 'to reserve to the State commissions the control of intrastate telephone traffic. We have kept in mind the fact that the Interstate Commerce Commission, through the Shreveport decision and the decisions in other similar cases, has gone so far in the regulation of railroads that the so-called 'State regulation' amounts to very little. . . . (T)he State commission representatives were jealous, in the preparation of this bill, that those rights should be protected; and we have attempted to do that.' 78 Cong.Rec. 8823 (1934) (Italics added).
 
 
 33
 Likewise, Representative Rayburn, Chairman of the House Committee on Interstate and Foreign Commerce, when introducing the bill, stated, 'Paragraph (b) (of § 221) leaves local exchange service to local regulation even where a portion of such local exchange service constitutes interstate communications.' 78 Cong.Rec. 10314 (1934). While it is true both the House and Senate Reports, and both Rep. Rayburn and Sen. Dill indicated that § 221 would take care of the situation where cities are located within two states, the section was incorporated at the request of State commissions, and embodied language which encompassed concerns of the State commissions and of Congress beyond the mere overlapping of telephone exchanges of cities into more than one State. The broad language of § 221(b) bears this out:
 
 
 34
 '(b) Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire, mobile, or point-to-point radio telephone exchange service, or any combination thereof, even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority.'
 
 
 35
 I suggest the legislative history does not indicate that this language should be construed to apply only to cities which overlap state lines, rather the fact that the language was included at the vigorous request of the State commissions indicates that the section should be read literally and to deny the FCC jurisdiction over intrastate facilities even though incidentally used in interstate commerce. As Representative Rayburn pointed out, this law does 'not apply to a telephone receiving set, or anything like that.' House Hearings 179.
 
 
 36
 That the state should be read literally has been affirmed by the FCC in more recent pronouncements. In 1954, language was added to the statute to include in it 'mobile, or point-to-point radio telephone exchange service.' The legislative history of this amendment is quite enlightening. See 1954 U.S.Code Congressional and Administrative News, p. 2133 et seq.
 
 
 37
 The Senate Report on the bill states in a separate sub-heading styled 'PURPOSE,' 'The purpose of the legislation is to clarify the provisions of the Federal Communications Act with regard to the jurisdiction of the Federal Communications Commission over telephone and telegraph companies which are engaged primarily in intrastate activities and which therefore, should be subject to State and local regulation rather than Federal regulation. . . . The legislation is designed to make certain that the use of radio will not subject to Federal regulation companies engaged primarily in intrastate operations.' The factual problem which brought about the legislation was the installation of mobile telephones in vehicles, farm houses in rural communities, isolated business developments, seasonal resort areas, etc. While stating that the Justice Department made no recommendation as to whether or not the amendments should be passed, the Deputy Attorney General, in an official communication to the Chairman of the Senate Committee on Interstate and Foreign Commerce, stated, as a construction of the legislation, that '(t)he purpose of the measure is to make certain that the use of radio in the communication service by telephone and telegraph companies which are engaged primarily in intrastate activities will not subject them to the jurisdiction of the Federal Communications Commission.'
 
 
 38
 Of equal or greater interest and authority is the official comment of the Federal Communications Commission to an official inquiry from the Senate Committee on Interstate and Foreign Commerce found at pp. 2135--6 of U.S.Code, Congressional and Administrative News, 1954. Among other comments, the Commission stated '. . . it would be clear that the Commission would not have regulatory jurisdiction over the services in question had they in fact been conducted by wire.' p. 2136. This is not only a letter from the Chairman of the Commission;[1] it is the act of the Commission itself construing the statute with which we are immediately involved, and was adopted by the Commission December 18, 1953.
 
 
 39
 We are faced with the situation, as I see it, that the FCC, from 1934 until 1974, construed the statute in question so that it did not have jurisdiction to regulate attachments to intrastate facilities which were subject to State regulation as provided for under § 221(b) of the statute. Certainly, the great weight given an administrative construction of a statute by its administrator must weigh heavily against the position the FCC now takes. Its change of position, after 40 years of construction of the statute denying its own jurisdiction, furnishes no reason to read the statute other than literally and consistently with the construction given to it by Congress at the time it was enacted and by the agency itself for years thereafter.
 
 
 40
 I think, then, that the statute, § 221(b), means at the least that Congress provided for State regulation of the services, facilities, etc., as mentioned therein as were at that time subject to State regulation, 'even though' in the words of the statute[2] the services or facility might incidentally be used in interstate communication as in an exchange astride a State line.[3]
 
 
 41
 I submit the intent of Congress was to establish a regulatory scheme for telephone companies, which envisioned a system of divided jurisdiction, Federal or State, rather than a system of primary jurisdiction, Federal then State, and that the jurisdiction of the State regulatory authorities was intended to be regulated by Congress, not by the whim of the Federal Communications Commission. While the power of Congress to regulate commerce under the Constitution has not been doubted since Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23 (1824), that opinion itself points out that Congress may entirely legitimately manifest '. . . an intention to leave this subject entirely to the States until Congress should think proper to interpose.' 9 Wheat. at 208.
 
 
 42
 No more reason exists for a federal regulatory commission to assert jurisdiction it does not have than exists for a federal court to do so. It should have '. . . no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given.' Cohens v. Virginia, 6 Wheat. 264, 404, 5 L.Ed. 267 (1821). The FCC here not only, or even principally, usurps the regulatory authority of the States; it usurps the right of Congress to provide for regulatory jurisdiction.
 
 
 43
 While the opinion of the court may seem to relegate the precise question of the statutory jurisdiction of the FCC to almost an afterthought, I think it is the most important and very nearly the only issue of real consequence in the case. Jurisdiction carries with it the right to regulate revenue--not only the amount, but who gets it, and its source. Depriving the States of jurisdiction deprives them of the right to regulate, which in turn deprives them of the right to distribute the burden of telephone service among the various classes of customers. As a practical matter, this assertion of federal primacy necessarily and directly affects the intrastate rates which may be charged, jurisdiction of which could not be more clearly reserved to the States. The result we arrive at, then, I suggest was never dreamed of by Congress.
 
 
 44
 Today, we allow the FCC to regulate only a facility mentioned in the statute as reserved for State regulation, but by approving the principle, we establish precedent of affirming FCC regulation of those matters mentioned in § 221(b) as reserved to the States. No reason would then exist for the FCC not to regulate 'charges, classifications, practices, (and) services,' other matters specifically reserved for State regulation by the same statute, and it must now be taken as the law that any continued State regulation of 'charges, classifications, practices, (and) services' is by grace of the Federal Communications Commission, not by act of Congress, for we have approved the principle of FCC assertion of primary jurisdiction.
 
 
 45
 While there may be no doubt that Congress had the power to grant the FCC jurisdiction over intrastate facilities that are used incidentally in interstate commerce, such as the inter-connection of customer provided equipment involved here, as I read the statute and legislative history, Congress specifically declined so to do in the face of some who argued that it should.[4] As Congress did not confer jurisdiction on the Federal Communications Commission, it is not for us to consider whether it should have then, or whether it should now. I think it has not, and any change in the jurisdictional regulatory scheme is a matter for Congress and not for the courts.
 
 
 
 *
 Senior United States Circuit Judge William H. Hastie of the United States Court of Appeals for the Third Circuit
 
 
 **
 Senior United States Circuit Judge Elbert Parr Tuttle of the United States Court of Appeals for the Fifth Circuit
 
 
 [1]
 In adjudicating this controversy, FCC took notice of a somewhat similar regulation recently adopted by the Oklahoma Corporation Commission
 
 
 [2]
 We have considered and have found no merit in an argument that the Commission's resort to a declaratory order was premature and unwarranted because state agencies are merely threatening to prohibit or restrict the use of customer-provided terminal equipment and have not yet imposed any such restriction as the proceeding now pending before the North Carolina Utilities Commission is designed to accomplish
 Unlike United States district courts, federal administrative agencies are not restricted to adjudication of matters that are 'cases and controversies' within the meaning of Article III of the Constitution. Sections 4(i) and (j) and 403 of the Communications Act confer upon FCC broad power to issue orders appropriate for the performance of its functions under the Act. And section 5(e) of the Administrative Procedure Act, 5 U.S.C. § 554(e), provides that an administrative agency such as FCC, 'in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty'.
 In paragraph 22 of its memorandum opinion in this case the Commission has asserted that '(t)he course being pursued by . . . (North Carolina Utilities Commission) and the Attorney General of Nebraska, and possibly other States, is a source of great controversy and confusion for manufacturers and users of customer-provided communications equipment and also casts doubt on the . . . application and effect of . . . tariffs on file with this Commission . . .. We would be remiss in the discharge of our broad statutory responsibilities to remain passive in the face of the policy and regulatory confusion which permeates the entire filed of interconnection . . .'. 45 F.C.C.2d 204, 214. The record amply supports this statement. In this connection, it appears without contradiction that the market for customer-provided communications equipment has expanded rapidly in recent years and now is being affected adversely by the state threat of new restrictions upon interconnections.
 We have no doubt that the matters presented in this proceeding were ripe for consideration and appropriate for disposition by declaratory ruling.
 
 
 [3]
 Six petitions for review have been filed in or transferred to this court where they have been consolidated for hearing and decision
 
 
 [4]
 Section 1 of the Act is numbered § 151 in the United States Code. Throughout this opinion sections of the Act will be designated by their original numbers
 
 
 [5]
 Carter v. AT&T Co., N.D.Tex.1966, 250 F.Supp. 188, 190, aff'd, 5th Cir. 1966, 365 F.2d 486, cert. denied, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546. Although litigants, like courts, may experience a change of mind, it is noteworthy that AT&T's present position seems to be that FCC has no jurisdiction, the antithesis of primary jurisdiction, over terminal equipment that is used for both interstate and intrastate communication
 
 
 [6]
 To support their contentions about the intended effect of section 2(b), the opposing parties have cited particular statements made in Congressional committee reports, or on the floor during debate, or by witnesses during the 1934 Senate and House hearings on the then newly proposed federal communications legislation. These references certainly show concern that, as a result of the so-called Shreveport rate decision, Houston, E. & W. Texas Ry. v. United States, 1914, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341, the Interstate Commerce Commission had been able to deprive state authorities of almost all regulatory power over intrastate rail transportation. And there was rather general agreement that this should not be done by the new federal commission in the communications field. However, it is equally clear that such little particularization as appears in the various statements of state concerns focuses upon the desire of state authorities to regulate local telephone rates and charges. See the statements of Mr. Clardy and Mr. McDonald, both senior officers of the National Association of Railroad and Utilities Commissioners, Hearings on S.2910 before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. 155, 156. Of course, rate making typifies those activities of the telephone industry which lend themselves to practical separation of the local from the interstate in such a way that local regulation of one does not interfere with national regulation of the other. Focusing upon this type of local regulation, members of Congress and the witnesses they heard did not discuss the impact, if any, of section 2(b) on the type of regulation we now are considering. However, one of the above mentioned industry witnesses, Mr. Clardy, did make this perceptive comment:
 '. . . (W)e now have a great deal of difficulty in saying what is interstate and what is intrastate property . . . because every exchange and every piece of machinery and all help and everything else, may at any moment be carried over exclusively, temporarily at least, into interstate business. There has got to be some new philosophy developed, perhaps, by this Commission to assist the State commissions in proper determination . . ..' Hearings on H.R.8301 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 73.
 In our view, the legislative history of the Act furnishes no impressive guidance for our determination of the reach of section 2(b). In any event, we are satisfied that it is not inconsistent with the view that the purpose of section 2(b) is to restrain the Commission from interfering with those essentially local incidents and practices of common carriage by wire that do not substantially encroach upon the administration and development of the interstate telephone network.
 
 
 [7]
 See Interstate and Foreign MTS and WATS, Docket 1958, initiated 35 F.C.C.2d 539, 543 and broadened by supplementary orders. See also the pending inquiry as to economic implications of customer interconnection policies at Docket 20003, F.C.C. 74--344, April 1974
 
 
 [8]
 Pub.L. 92--131, 85 Stat. 363
 
 
 [9]
 The Senate Committee Report on this bill, S.Rep. No. 92--362, 92d Cong., 1st Sess., makes it clear that need for the proposed new section 410(c) procedure grew out of the circumstance that, while the 'Federal Government regulates interstate carrier services (and) . . . the States exercise jurisdiction over intrastate toll and local exchange services. . . . the plant facilities are to a great extent the same for both. The household telephone instrument, for example, is the same whether the call is made intrastate or interstate'. 2 U.S.Code Cong. & Admin. News, 92d Cong. 1st Sess., 1971, at 1511, 1512
 
 
 [10]
 All other points made by any petitioner and not discussed in this opinion have been considered and found to lack merit
 
 
 [11]
 Mr. Rayburn, presenting the 1934 bill on the floor of the House, explained that section 221(b) 'is designed to cover cases of cities located within two States, as Texarkana'. 78 Cong.Rec. 10314. Similarly, on the Senate floor, Senator Dill, explaining the reach of the amendment, cited the uncertain status of metropolitan Washington and New York areas as essentially local exchanges that crossed state lines. 78 Cong.Rec. 8823. The Committee reports in both the Senate and the House are explicit in saying that section 221(b) is intended to enable state commissions 'to regulate exchange services in metropolitan areas overlapping State lines'. S.Rep. No. 781, 73rd Cong.2d Sess., 5; H.R.Rep. No. 1850, 73rd Cong., 2d Sess., 7
 
 
 [1]
 An official letter from the Chairman of the FCC to the Chairman of the Senate Sub-Committee on the Handicapped, who had inquired whether the FCC required the hearing aid industry to provide equipment for the coupling of hearing aids to telephone instruments was to the same effect as the comment on the 1954 amendment. It stated the Act excluded the FCC from 'any authority,' and that 'such local service matters are subject to the regulatory authority of State commissions in the various States.' 119 Cong.Rec. S 17297, daily ed., Sept. 22, 1973
 
 
 [2]
 Interestingly enough, see the use of the words 'even though' used in a colloquy between F. B. McKinnon, President of the Independent Telephone Association, and the House Committee in the hearings, which corroborates the construction sought by the petitioners here. House Hearings, p. 248. No reason is presented to my satisfaction not to give the words their ordinary meaning
 
 
 [3]
 The facility involved here admittedly has been subject to State regulation
 
 
 [4]
 While the opinion of the court relies in part on the creation and existence of the federal-state joint board, a recent decision of the FCC illustrates the utter futility of relying on the FCC to heed the advice of the joint board which had attempted to protect the telephone companies from detrimental economic effect through revenue losses directly brought about by FCC assertion of jurisdiction over attachments to telephone systems. In the Matter of Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS), FCC Docket 19528 (March 18, 1976)