552 F.2d 1036
 NORTH CAROLINA UTILITIES COMMISSION et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Computer and Business Equipment Manufacturers Association et
al., Intervenors.
 Nos. 76-1002, 76-1152, 76-1292, 76-1415, 76-1443, 76-1467,
and 76-1502.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 21, 1976.
Decided March 22, 1977.
 
 Edward B. Hipp, Raleigh, N.C., for State of North Carolina Utilities Commission.
 Carl E. Sanders, Augusta, Ga. (John L. Taylor, Jr., Atlanta, Ga., on brief) for Southeastern Association of Regulatory Utilities Commission.
 William L. Leonard, New York City, Ohio (F. Mark Garlinghouse Edward L. Friedman and Alfred C. Partoll, New York City, Michael Boudin, Stuart C. Stock, Washington, D.C., on brief), for Bell System Companies.
 Thomas J. O'Reilly, Washington, D.C. (Lloyd D. Young, Washington, D.C., on brief), for United States Independent Telephone Association (William J. Brown, Charles S. Rawlings and Cheryl Hachman, Columbus, Ohio, on brief for Public Utilities Commission of Ohio; Marshall Cox, New York City, on brief for Continental Telephone Corp.; Richard R. Zaragoza, and Clifford M. Harrington, Washington, D.C., on brief for Rixon, Inc.; Michael T. Tomaino, Rochester, N. Y., on brief for Rochester Telephone Corporation; John M. Lothschuetz, Mansfield, Ohio, and Carolyn C. Hill, Washington, D.C., on brief; Warren E. Baker and Richard J. Croker, Kansas City, Mo., on brief for United System Service Inc. and the United Telephone System operating companies).
 Daniel M. Armstrong, Associate Gen. Counsel, FCC, Washington, D.C. (Werner K. Hartenberger, Acting Gen. Counsel, Sheldon M. Guttman and Jack D. Smith, Counsel, FCC, Washington, D.C., on brief).
 Joseph M. Kittner, Washington, D.C. (Edward P. Taptich and Virginia S. Carson, McKenna, Wilkinson & Kittner, Washington, D.C., on brief), for Computer and Business Equipment Manufacturers Association.
 Edwin B. Spievack, Washington, D.C. (Joel H. Levy, Cohn & Marks, Washington, D.C., on brief), for North American Telephone Association.
 Stephen R. Bell, Washington, D.C. (Herbert E. Marks, Wilkinson, Cragun & Barker, Washington, D.C., on brief), for Independent Data Communications Manufacturers Association, Inc. (Donald I. Baker, Acting Asst. Atty. Gen., Washington, D.C., Robert B. Nicholson and James Ponsoldt, Attys. Dept. of Justice, Washington, D.C., on brief; Charles R. Cutler, John L. Bartlett, John B. Wyss, Kirkland, Ellis & Rowe, Washington, D.C. on brief for Aeronautical Radio, Inc.; John S. Voorhees, Howrey & Simon, Washington, D.C., on brief; Robert E. McKee, New York City, on brief for International Telephone and Telegraph Corp.; Grant S. Lewis, Jay G. Safer, LeBoeuf, Lamb, Leiby & MacRae, New York City, on brief; Jay E. Ricks, Robert R. Bruce, Hogan & Hartson, Washington, D.C., on brief for Phone-Mate, Inc.; Irving K. Kaler, Lawrence J. Movshin, Kaler, Karesh & Frankel, Atlanta, Ga., on brief for Rollins Protective Services Co.; Joseph E. Keller, Wayne V. Black, Larry S. Solomon, Keller & Heckman, Washington, D.C., on brief for Central Committee on Telecommunications of the American Petroleum Institute; William H. Borghesani, Jr., Keller & Heckman, Washington, D.C., on brief for Dasa Corp.; J. Roger Wollenberg, David R. Anderson, Neil J. King, Michael S. Schooler, Wilmer, Cutler & Pickering, Washington, D.C., on brief for International Business Machines Corp.; J. Gordon Walter, Armonk, N. Y., on brief for International Business Machines Corp.; Rich M. Stein, Sigelman & Stein, Beverly Hills, Cal., on brief for Phonetele, Inc.; Charles M. Meehan, Carole C. Harris, Keller & Heckman, Washington, D.C., on brief for Utilities Telecommunications Council).
 Paul L. Douglas, Atty. Gen., C. C. Sheldon, Asst. Atty. Gen., Lincoln, Neb., on brief, for amicus curiae State of Nebraska ex rel. Nebraska Public Service Commission.
 Before RIVES,* TUTTLE,* and WIDENER, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 This is a case of second impression. In North Carolina Utilities Commission v. FCC, 537 F.2d 787 (4th Cir. 1976), petition for cert. denied, --- U.S. ----, 97 S.Ct. 651, 50 L.Ed.2d 631, (1976), this Court upheld a declaratory ruling of the Federal Communications Commission that the Communications Act of 1934 preempts state regulation of telephone terminal equipment used for both interstate and local communication when such regulation conflicts with federal rules governing the same equipment. This appeal concerns the validity of the FCC's attempt to exercise that primary authority.
 
 
 2
 I. THE TERMINAL EQUIPMENT REGISTRATION PROGRAM
 
 
 3
 The phrase "terminal equipment" refers to devices utilized for transmission or reception of communications when attached to the national telecommunication line network. Items of terminal equipment include common residential telephones (both main station and extension phones), key telephones, answering devices, dialers, computer terminals and private branch exchanges (PBX's). Although most telephone customers rent or purchase terminal equipment directly from telephone companies, the carriers themselves purchase a substantial portion of their terminal equipment from independent manufacturers as well as carrier-controlled subsidiaries.
 
 
 4
 In Docket 19528, the present case, the Federal Communications Commission (FCC) has by rule established a registration program for all terminal equipment attached to the interstate telephone line network. Attachment of terminal equipment is currently restricted by telephone company tariffs which allow customer connection of non-carrier-supplied terminal equipment to the telephone lines only if the customer effects connection through a carrier-supplied connecting arrangement (CA) and employs a carrier-supplied network control signaling unit (NCSU). The proposed FCC program would permit customers to attach any registered terminal equipment to the network without being forced to use the carrier-supplied intermediary devices.
 
 
 5
 To be registered with the FCC, equipment must meet technical specifications that ensure proper performance and safety without the intermediary CAs and NCSUs. Nonregistered equipment can still be attached provided the intermediary devices are employed. All terminal equipment, including that provided by carriers directly to customers, must be registered (or attached using CAs and NCSUs). Individual items of terminal equipment, however, need not be registered; instead, manufacturers will be required to register types or models of equipment.
 
 II. THE CONDITIONS OF CONTEST
 
 6
 A. The Statutory Scheme. The Communications Act of 1934, 47 U.S.C.A. §§ 151-609 (1962 & Supp. 1976), created the Federal Communications Commission for "the purpose of regulating interstate and foreign commerce in communications by wire and radio so as to make available . . . a rapid, efficient, Nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges," Communications Act § 1, 47 U.S.C.A. § 151. Section 2(a) of the Act, 47 U.S.C.A. § 152(a), provides that the Act and the FCC's jurisdiction "shall apply to all interstate and foreign communication by wire." This general grant of authority to the FCC is amplified by section 3(a), 47 U.S.C.A. § 153(a), to encompass "the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire . . . including all instrumentalities, facilities, apparatus, and services incidental to such transmission.." (Emphasis added.)
 
 
 7
 The Commission's major substantive powers over common carriers are described by sections 201-205 of the Act, 47 U.S.C.A. §§ 201-205. Section 201(b) requires that all "charges, practices, classifications, and regulations for and in connection with (interstate) communication service, shall be just and reasonable." Section 202(a) declares it to be "unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services" of interstate communication. Section 203 and 204 mandate procedures for tariff filings by carriers and for FCC review of proposed tariffs. Although the FCC may simply disapprove a proposed tariff provision and require refiling by a carrier, section 205 also gives the FCC power to "prescribe what will be the just and reasonable charge . . . and what classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed" by the carrier.
 
 
 8
 The Communications Act also reserves some regulatory jurisdiction to the states. Section 2(b)(1) of the Act, 47 U.S.C.A. § 152(b)(1), provides that "nothing" in the Act shall be construed to give the Commission jurisdiction "with respect to . . . charges, classifications, practices, services, facilities or regulations for or in connection with intrastate communication service." (Emphasis added.) Section 221(b) of the Act, 47 U.S.C.A. § 221(b), carves out a second area of state regulatory hegemony by denying the Commission jurisdiction with respect to "charges, classifications, practices, services, facilities or regulations for or in connection with . . . telephone exchange service" where "such matters are subject to regulation by a State commission or by local governmental authority" even though "a portion of such exchange service constitutes interstate or foreign communication."
 
 
 9
 The tension between the powers granted to the FCC by sections 2(a) and 3(a), and the powers reserved to the states by sections 2(b)(1) and 221(b), generates this particular appeal. The validity of the Commission's registration program, however, cannot be properly determined without reference to the development of the Commission's interconnection policy.
 
 
 10
 B. The Interconnection Policy and North Carolina I. Prior to 1969, AT&T tariffs filed with the Commission prohibited attachment of any non-carrier-supplied terminal equipment to the telephone line network.[1] Earlier in 1966, manufacturers of the Carterphone device, which enabled a radio transmitter to interconnect with the telephone network, had attacked the tariff as an antitrust violation, but the courts held that the FCC had primary jurisdiction to determine the lawfulness of the inclusion of the blanket prohibition in an FCC-approved tariff. Carter v. AT&T Co., 250 F.Supp. 188, 190 (N.D.Tex.), aff'd 365 F.2d 486 (5th Cir. 1966), cert. denied 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). The FCC then found that the absolute prohibition of customer interconnection was unreasonable and unjustly discriminatory in violation of sections 201 and 202 of the Act. Carterphone v. AT&T, 13 F.C.C.2d 420 (1968),reconsideration denied, 14 F.C.C.2d 571.[2] The Commission did not, however, affirmatively prescribe any specific interconnection policy for the carriers, as it might have done pursuant to section 205. Rather, it declared the AT&T tariff to be invalid, and permitted the carriers to refile. 13 F.C.C.2d at 425.[3] The carriers responded by filing tariffs that contained the current CA and NCSU requirements. The Commission did not object to the refiled tariffs, and permitted them to become effective without scheduling a formal investigation, see AT&T "Foreign Attachment" Tariff Revisions, 15 F.C.C.2d 605 (1968), 18 F.C.C.2d 871 (1969), although the FCC still retained authority to investigate the lawfulness of the tariffs in the future, see 47 U.S.C.A. § 403.[4]
 
 
 11
 Despite this federal tariff permitting interconnection of terminal equipment (as long as CAs and NCSUs were used), several state regulatory commissions in the early 1970's planned to forbid interconnection of non-carrier-supplied terminal equipment with local exchanges, except where such equipment was used exclusively for interstate communication. Because separation of terminal equipment used exclusively for local communication is a practical and economic impossibility, the proposed state rules would have scuttled the federal interconnection policy. Acting on the petition of independent equipment manufacturers, the FCC ruled that state commissions were precluded from regulating or restricting interconnection in any fashion that conflicted with FCC regulations governing the same equipment. In the Matter of Telerent Leasing Corp., 45 F.C.C.2d 204 (1974).
 
 
 12
 On appeal to this Court, the FCC's action was affirmed. North Carolina Utilities Commission v. FCC, 537 F.2d 787 (4th Cir. 1976) (North Carolina I ), petition for cert. denied, --- U.S. ----, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). The Court first noted the impossibility of separating interstate terminal equipment from local terminal equipment: the same telephones are used for both interstate and local communications. Thus, if state commissions could lawfully prohibit interconnection unless terminal equipment is used exclusively for interstate communications, federal tariffs authorizing interconnection would be made nugatory. Conversely, if federal regulations permitting interconnection are primary, it becomes a practical impossibility for the states to prohibit interconnection with respect to purely intrastate communication. Something had to give.
 
 
 13
 This Court held that FCC authority to regulate interconnection of equipment used for both interstate and local communication was paramount. Considerations of congressional purpose, of statutory provision for parallel situations, and of established agency practice informed the Court's decision. First, the Court pointed out that the Communications Act's primary purpose of establishing an efficient interstate communications network "with adequate facilities at reasonable charges," see 47 U.S.C.A. § 151, would be jeopardized if federal regulation of jointly used equipment could be countermanded by state rules. Second, the Court found that other provisions of the Communications Act establish federal primacy where the control of facilities used for both interstate and local communication is concerned. Sections 2(b)(2) through 2(b) (4), for example, make intrastate carriers subject to FCC regulation when they provide interstate service by hooking up with the lines of interstate carriers, see 47 U.S.C.A. § 152(b)(2)-(4); and section 410(c) establishes federal preeminence in the allocation of rate base between interstate and local services, see 47 U.S.C.A. § 410(c) (Supp.1976). Finally, invoking the principle that an agency's established construction of its enabling legislation is entitled to deference,[5] the Court noted that the FCC has consistently asserted its jurisdiction over facilities and equipment used in both interstate and local communication.
 
 
 14
 C. The Present Challenge. The genesis of this dispute was the Commission's determination, shortly after its 1969 Carterphone decision, to study the technical justifications for the carrier-promulgated connecting arrangement tariffs. This investigation was formalized in Docket 19528 for the announced purpose of ascertaining the best technical method of effecting the interconnection policy. In its Notice of Inquiry, the FCC attempted to insulate Docket 19528 from any further dispute about the wisdom of interconnection as a policy goal by stating that "it is not our intention to consider . . . any question as to whether there should be any modification of our holding in Carterphone or any revisions in the tariff provisions applicable to" customer interconnection, 35 F.C.C.2d 539, 542 (1972). The Commission did, however, begin a separate proceeding Docket 20003 to consider, inter alia, the long-term economic impact of liberalized interconnection, and expressed a willingness to consider evidence contrary to the public policy judgment adumbrated by Carterphone. Customer Interconnection, 46 F.C.C.2d 214, 216-218 (1974). A First Report in Docket 20003 was issued after oral argument but before decision in this case.[6]
 
 
 15
 The Commission has rendered its final orders implementing the terminal equipment registration program. First Report and Order in Docket No. 19528, 56 F.C.C.2d 593 (1975); Second Report and Order in Docket No. 19528, 58 F.C.C.2d 736 (1976) (hereinafter denominated as First Report and Second Report ). Pursuant to section 402(a) of the Communications Act, 47 U.S.C.A. § 402(a) (1962), and section 2342(1) of Title 28, petitioners most of whom are telephone companies (carriers) or state utility commissions contest the validity of the FCC's registration program. The numerous claims made by petitioners can be systematically analyzed under three rubrics:
 
 
 16
 (1) allocation of power does the FCC, as opposed to state regulatory commissions, have statutory authority to control customer interconnection when the "facilities" (i.e., the terminal equipment) attached to the national network are themselves used over 97% of the time for local, as opposed to interstate, communication;
 
 
 17
 (2) delegation of power assuming FCC jurisdiction over joint terminal facilities, does the Communications Act give the Commission power to impose a registration program, to include the carriers in it, and to indirectly regulate non-carrier-affiliated manufacturers of terminal equipment; and
 
 
 18
 (3) exercise of power assuming the FCC possesses the authority to do what it proposes, has the Commission exercised that authority in accordance with procedures required by law.
 
 
 19
 III. ALLOCATION OF POWER BETWEEN THE STATES AND THE FCC
 
 
 20
 A. Reconsideration Considered. Petitioners mount their first assault over old terrain: they contend that sections 2(b)(1) and 221(b) of the Act expressly deny the FCC jurisdiction over equipment used "predominantly" in local communication.[7] Seizing on the word "nothing" in sections 2(b)(1) and 221(b), petitioners contend that these reservation clauses override any potentially contrary language elsewhere in the statute. Respondents counter by invoking the doctrine of stare decisis and this Court's policy of interpanel accord.[8]
 
 
 21
 It is true that North Carolina I rejected the jurisdictional challenge that petitioners press here; stare decisis would normally bar a reprise. "But stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable." Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940) (Frankfurter, J.) In the special and novel circumstances of this case, which implicates significant state and federal interests and which involves questions of statutory interpretation that have been considered by no other Court of Appeals, we conclude that stare decisis does not preclude reconsideration of our holding in North Carolina I. The mere fact that a prior opinion exists is not sufficient in itself to call the doctrine of stare decisis into play: otherwise one rogue opinion could deprive the law of the accumulated expertise that stare decisis strives to safeguard.
 
 
 22
 If the rule of interpanel accord serves a purpose different from that of stare decisis, its purpose must be to allocate decisionmaking power between coequal panels subject to reversal by the Court of Appeals en banc. Because en banc review in this case is prevented by disqualification of all but one of the active Judges of this Court, strict application of the rule of interpanel accord seems unwarranted. We therefore reach the merits of petitioners' jurisdictional challenge.
 
 
 23
 B. The Scope of Section 221(b). Section 221(b) of the Act, 47 U.S.C.A. § 221(b) (1962) provides:
 
 
 24
 "(N)othing in this chapter shall be construed . . . to give the Commission jurisdiction, with respect to . . . practices, services, facilities or regulations for or in connection with . . . telephone exchange service . . . even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or local governmental authority."
 
 
 25
 (Emphasis added.)
 
 
 26
 The term "telephone exchange service" is a statutory term of art, and means service within a discrete local exchange system, see 47 U.S.C.A. § 153(r); compare 47 U.S.C.A. § 153(s) (definition of "toll," or long distance, service). As we pointed out in North Carolina I, the legislative history of section 221(b) leaves no doubt that the purpose of section 221(b) is to enable state commissions to regulate local exchange service in metropolitan areas, such as New York, Washington or Kansas City, which extend across state boundaries. 537 F.2d at 795 & n.11. On this appeal, petitioners do not object to that determination, apparently agreeing with our view that "by force of section 221(b) a local carrier that serves a single multi-state exchange area is assured whatever degree of freedom from federal regulation section 2(b) provides for uni-state carriers and intrastate telephone business generally," 537 F.2d at 795. Section 221(b) simply does not apply to the "facilities" with which this appeal is concerned.
 
 
 27
 C. The Scope of Section 2(b)(1). Section 2(b)(1) of the Act, 47 U.S.C.A. § 152(b)(1) (1962), provides:
 
 
 28
 "(N)othing in this chapter shall be construed to . . . give the Commission jurisdiction with respect to . . . practices, . . . facilities, or regulations for or in connection with intrastate communication service . . .."
 
 
 29
 (Emphasis added.)
 
 
 30
 North Carolina I correctly reasoned that if section 2(b)(1) were construed to give the states primary authority over joint terminal equipment, i.e., equipment used interchangeably for interstate and intrastate service, then whenever state regulations conflicted with federal rules applicable to interstate calls the FCC would necessarily be prevented from discharging its statutory duty under sections 1 and 2(a) to regulate interstate communication. Petitioners' emphasis on the word "nothing" in section 2(b)(1) is an attempt to employ a definitional stop to prevent the Court from reaching North Carolina I's otherwise dispositive argument. Essentially, petitioners contend that the statute itself mandates state control over jointly used terminal equipment, and that therefore no possible duty of the FCC with respect to interstate communication can be compromised.
 
 
 31
 Petitioners' argument begs the question. Even if the word "nothing" overrides any contrary language, the argument fails to identify those "intrastate" facilities over which state jurisdiction is to be primary. The question is whether jointly used facilities are to be classified for jurisdictional purposes as the "interstate" facilities of sections 1, 2(a) and 3(a), or as the "intrastate" facilities of section 2(b)(1). Sections 1, 2(a) and 3(a) commit jurisdiction over facilities utilized in interstate communication to the FCC. Section 2(b)(1) does not deny the FCC jurisdiction with respect to interstate facilities: it excludes only intrastate facilities from FCC jurisdiction. The terminal equipment dealt with in the order appealed from is used for both interstate and intrastate communication. The withdrawal of jurisdiction over one cannot be read to mean the withdrawal as to the other. Based on the statutory policy of centralizing control over interstate communications in the FCC, the otherwise plenary jurisdiction conferred by sections 201-205, and the recognition by section 410(c) of federal supremacy in rate base allocation, we concluded in North Carolina I that the "intrastate" facilities of section 2(b)(1) were those facilities "separable from and . . . not substantially affect(ing) the conduct or development of interstate communications," 537 F.2d at 793. Congress' use of the word "nothing" in no way detracts from this analysis, nor does it suggest as do petitioners that the "intrastate" facilities of section 2(b)(1) are those items of terminal equipment used "predominantly" for local communication.
 
 
 32
 Petitioners confuse the fact that almost all terminal equipment is and has been used predominantly for local communication, with the statutory division of decisionmaking power. We find it difficult to credit an argument which amounts to an assertion that Congress created a regulatory scheme that depends on the calling habits of telephone subscribers to determine the jurisdictional competence of the FCC versus state utility commissions. There can be no doubt that, when the Communications Act was passed, Congress envisioned circumstances in which the same equipment would be employed for both interstate and local communication: section 221(b)'s special provisions governing multistate local exchanges are testimony enough. Particularly revealing, therefore, is the fact that although Congress secured to the states control over multistate exchanges "even though a portion of such exchange service constitutes interstate or foreign communication," 47 U.S.C.A. § 221(b), it included no similar language in the reservation clause of section 2(b)(1). Section 2(b)(1) does not deny the Commission jurisdiction with respect to interstate facilities "even though a portion of the use of such facilities is for interstate communication." Indeed, the language of section 221(b) is a reproach to petitioners' construction of section 2(b)(1). The explicit language of section 221(b) shows that when Congress meant to give primary authority over inter- and intra-state facilities to the states, it was capable of unambiguously expressing that purpose.
 
 
 33
 A brief consideration of the potential consequences of state control over jointly used terminal equipment confirms our interpretation of section 2(b) (1). Surely petitioners would not contend that if a state commission authorized interconnection of a terminal equipment device which actually interfered with the transmission of interstate communications, the FCC would be powerless to order the removal of the device. And once it is recognized that FCC regulations must preempt any contrary state regulations where the efficiency or safety of the national communications network is at stake, there can be little argument that FCC regulation of jointly used terminal equipment for the purpose of improving or expanding interstate communication services may not also displace conflicting state regulations. The aim of the Communications Act, after all, is not limited to achievement of a minimally efficient, nondangerous national network. Instead, Congress has declared its purpose to be the creation of "a rapid, efficient, Nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." Communications Act § 1, 47 U.S.C.A. § 151. If it is admitted as we think it must be that the FCC has full statutory authority to regulate joint terminal equipment to ensure the safety of the national network, then we can discover no statutory basis for the argument that FCC regulations serving other important interests of national communications policy are subject to approval by state utility commissions.
 
 
 34
 D. The Implications of Federal Control Over Interconnection. Petitioners characterize the registration program as an assumption of power similar to that given the Interstate Commerce Commission by the "Shreveport Doctrine" of Houston, East & West Texas Railway v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), a result that Congress sought to avoid in drafting the Communications Act. In the Shreveport case, Louisiana shippers were shut out of Texas markets by a system of intrastate rates under which rates for shipments by interstate carriers eastward from Dallas and Houston to points in Texas were set to undercut ICC rates for shipment by the same carriers over the same distances westward from Shreveport into Texas. The Supreme Court held that the ICC was not limited to lowering the interstate rates as a remedy for the discrimination against interstate commerce worked by the Texas rate system. To so limit the ICC, the Court reasoned, would force the ICC to stultify its own judgment as to reasonable interstate rates. The ICC was therefore given the alternative of suspending the Texas intrastate rates, thus enabling the carriers to raise local rates to federal levels for similar distances. Despite a proviso in the ICC legislation similar to the jurisdictional reservation of section 2(b)(1) of the Communications Act, the Supreme Court held that the state power over exclusively local rates was inviolable only where local rates, in comparison with interstate rates, did not create unreasonable discriminations against interstate commerce. 234 U.S. at 357-58, 34 S.Ct. 833.
 
 
 35
 Petitioners correctly point out that in enacting the Communications Act, Congress sought to deny the FCC the kind of jurisdiction over local rates approved by the Shreveport Rate Case. We do not agree, however, that the registration program is some sort of regulatory atavism. Congress' dissatisfaction with the Shreveport doctrine was that it permitted the ICC to control the rates for exclusively local service because of the relationship between those rates and the interstate rates. But the FCC's registration program in no way purports to prescribe charges for local services; state commissions remain unfettered in their discretion to set rates for all local services and facilities provided by the telephone companies. Shreveport dealt specifically with rates for services which were admittedly local in nature; this appeal concerns the definition of what services and facilities are "intrastate" and hence subject to state rather than federal control.
 
 
 36
 The Supreme Court's recent decision in FPC v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), is particularly instructive. Section 201(b) of the Federal Power Act, 16 U.S.C.A. § 824(b), gives the Federal Power Commission jurisdiction with respect to the sale of electric energy at wholesale in interstate commerce, but denies the FPC jurisdiction over retail sales. This limitation, the Supreme Court noted, was designed to ensure that the Shreveport doctrine would not be employed to expand FPC jurisdiction:
 
 
 37
 "(T)he legislative history . . . indicat(es) that the section was expressly limited to jurisdictional sales to foreclose the possibility that the Commission would seek to correct an alleged discriminatory relationship between wholesale and retail rates by raising or otherwise regulating the nonjurisdictional, retail price."
 
 
 38
 426 U.S. at 277, 96 S.Ct. at 2003 n.5.
 
 
 39
 In Conway, the FPC contended that its lack of jurisdiction over retail sales not only prevented it from regulating retail rates to correct unreasonable discriminations against customers, but also precluded FPC action to change wholesale rates because of an alleged discriminatory or anticompetitive relationship between wholesale and retail sales. A unanimous Supreme Court held to the contrary, and affirmed the judgment of the Court of Appeals that the FPC was not precluded from adjusting wholesale rates as a means of responding to the problem of a discriminatory relationship between wholesale and retail rates. The jurisdictional limitation inspired by Congressional reaction to the Shreveport doctrine, said the Court, meant only that the FPC could not set retail rates as a means of dealing with the problem.
 
 
 40
 The lesson of FPC v. Conway Corp., in the circumstances of the instant case, is that the FCC has jurisdiction to prescribe the conditions under which terminal equipment may be interconnected with the interstate telephone line network. The FCC has not attempted to control the use of terminal equipment in local communication because of the effect that such use through the medium of the market has on interstate communication. Instead, the FCC has established a registration program governing the interconnection of terminal equipment when that equipment is used directly to effectuate interstate communication.
 
 
 41
 Petitioners counter by claiming that the effect of federal control of interconnection with respect to the national network will be to deprive the states of "meaningful" ratemaking power. The state commissions contend that they currently subsidize residence and one-phone consumer service by charging more for business equipment (PBX's and key phones) and for extension phones than the unit costs of such equipment. Apparently, the state commissions fear that increased substitution of independently provided terminal equipment for carrier-supplied equipment will reduce revenues and the corresponding amount of money available to subsidize other services and facilities.
 
 
 42
 We hold that the registration program as a jurisdictional matter does not jeopardize state ratemaking prerogatives to subsidize favored types of service. The states remain free to approve the pricing of carrier-supplied terminal equipment above or below unit cost. The effect of the federal program will depend upon the extent to which independents invade the terminal equipment market and undersell the regulated price. But cross-subsidization can still be accomplished by differential charges for services where there is no competition. For example, state commissions can permit carriers to classify and bill business line exchange service at rates higher than private line service if they desire to subsidize the latter.
 
 
 43
 Recognition of federal primacy in the regulation of jointly used terminal equipment no more curtails state ratemaking power as a matter of statutory jurisdiction than would the denial of state authority to set rates for interstate calls in order to subsidize local exchange and intrastate services. In the end, the problem of subsidy reduces to the tactical problem of obtaining sufficient revenues to cover the difference between the cost of providing subsidized service and the regulated price of subsidized service. Whether that amount is obtained by overcharging on PBX's, by overcharging on business phone exchange service, or even by direct legislative appropriation, is largely academic as far as statutory jurisdiction is concerned. Political expediency may encourage state commissions to defend their current option to bury subsidy costs in as many holes as possible, but this concern cannot be allowed to determine the allocation of jurisdictional competency between state and federal agencies.
 
 
 44
 To support their retention of "meaningful" ratemaking power, petitioners resort to the science of statutory interpretation. No part of a statute, they argue, should be read in a fashion that makes it "meaningless"[9]; and to establish FCC authority over jointly used terminal facilities as primary would, according to petitioners, render the term "facilities" in section 2(b)(1) meaningless.
 
 
 45
 Reliance on the maxim of meaningfulness is misplaced in the circumstances of this case. First, the maxim is only a guide for interpretation when analysis of statutory purpose fails to resolve a dispute about statutory meaning,[10] and carries little weight against the major policy arguments favoring FCC jurisdiction and the Commission's consistent assertion of FCC authority over jointly used equipment. Moreover, the maxim seems inappropriate to the construction of boilerplate language in an extremely general delegation statute. Finally, the Commission's construction makes the term "facilities" meaningless not because exclusively intrastate facilities cannot be built or imagined (indeed, some are already in existence), but because state commissions prefer to avoid the economic and political costs of forcing the general consumer to buy two sets of terminal equipment.
 
 
 46
 E. Agency Estoppel. It is true that most practices regarding terminal equipment have historically been regulated by the states, and that the FCC has always formulated its decisions in terms of equipment used for "interstate communication." Petitioners contend that these facts establish an FCC interpretation of the statute which should now be held to bar FCC jurisdiction over jointly used terminal equipment.
 
 
 47
 While we agree that an agency's construction of its enabling statute is entitled to deference from the courts, we have a good deal of difficulty with the more sweeping proposition that an agency is forever bound by its own prior view of its jurisdiction. Such a rule would not only be antithetical to the policy rationale for administrative agencies (ability to tailor broad legislative directives to fit specific problems), but would also contradict the central assumption of the rule respecting an agency's construction of its enabling statute. That assumption is that the agency's accumulated expertise makes it particularly well qualified to determine how the legislature might have dealt with a particular fact situation had that situation been among the conceptual paradigms to which the general language of a statute speaks. Petitioners' proffered rule of agency estoppel would confound that assumption by preventing an agency from revising its approach to problems on the basis of experience in dealing with the range of disputes generated by particular configurations of statutory powers and duties.
 
 
 48
 Moreover, agency estoppel could hardly be enforced on the facts of this case. FCC decisions not unexpectedly refer only to the use of equipment for "interstate communication," but the relevant cases firmly establish the Commission's view that when facilities are used for both interstate and local communication, state regulations must give way to federal regulations even though the latter unavoidably affect local communication in the process of regulating interstate communication. Thus in AT&T (Railroad Interconnection), 32 F.C.C. 337, 339 (1962), the FCC ruled that "there is no doubt that this Commission has jurisdiction over (local) exchange facilities to the extent that such facilities are used in accomplishing interstate toll communication." In cases involving the attachment of special mouthpieces to telephones,[11] the interconnection of radio base stations and telephone lines,[12] the attachment of recording devices to telephones,[13] the use of automatic answering devices,[14] the connection of teletypewriter equipment to the telephone network,[15] the regulation of the interconnection of right-of-way telephone lines and the national telephone network,[16] the control of the use of the telephone network for illegal purposes,[17] and the interconnection of military communications lines with the national network,[18] the FCC has never considered its jurisdiction inadequate because effectuation of the federal policy of interconnection might as a practical matter make enforcement of less liberal state rules difficult if not impossible. Additional reference to history would be otiose. The vast majority of terminal equipment has been and is regulated by the states, but the FCC has never conceded that joint equipment is beyond federal jurisdiction should the need for federal action arise.
 
 IV. DELEGATION OF POWER
 
 49
 Assuming but not conceding that the FCC possesses statutory jurisdiction over jointly used terminal equipment, petitioners argue that the registration program exceeds the FCC's statutory power over interstate carriers, and amounts to an impermissible assumption of power over non-carrier-affiliated manufacturers. Petitioners also object to required registration of carrier equipment because (1) authority for a registration program is not explicitly delegated by the Communications Act; (2) prior versions of section 215 granting a much broader power to investigate the "equipment" furnished to carriers, were not enacted; (3) FCC attempts to force AT&T to seek prior Commission approval before filing tariffs have been declared unlawful by the courts; and (4) the FCC has until the present never claimed the power to require registration of carrier equipment.
 
 
 50
 A. Independent Manufacturers We consider as no more than makeweight petitioners' claim that the registration program constitutes an impermissible regulation of independent manufacturers. That economic incentives may induce independent manufacturers to comply in order to compete effectively with registered products is immaterial: specifications for railroad rolling stock (which are directly applicable to carriers) under the Safety Appliance Acts have never been thought to constitute unlawful regulation of suppliers of rolling stock. We cannot see how the registration program which tells a customer which types of devices may be directly attached to the national network without the intermediary CAs and NCSUs can be seen as an unlawful attempt to regulate independent manufacturers. All manufacturers of terminal equipment, including the carriers and their subsidiaries, are free to register their equipment or not in accordance with their perceptions of economic self-interest.
 
 
 51
 In essence, what petitioners are attempting is the preservation of the carriers' private lawmaking authority over independent manufacturers. Present tariffs proposed by carriers permit interconnection without the use of CAs and NCSUs in cases where certain carrier-initiated attestation procedures are followed by manufacturers. Other carrier-initiated tariffs permit and sometimes require interconnection of non-carrier-supplied equipment in remote and/or hazardous areas. And the conditions under which right of way companies may interconnect with the national network are established by carrier-promulgated tariffs.[19] Surely it is anomalous for the carriers to invoke FCC authority to enforce these tariffs which regulate the use of private equipment, and yet deny that the Commission can prescribe carrier practices (as it clearly can under section 205) merely because such FCC action will have the effect of inducing private equipment manufacturers to alter the technical specifications of their products.
 
 
 52
 B. Carrier Inclusion. The contention that the absence of explicit statutory authorization prevents the FCC from adopting a registration program contradicts all relevant authority[20] and confounds the very purpose of agency delegation institutionalization of authority to fashion policies and programs that implement broad legislative mandates in presently unforeseeable circumstances.[21] The early versions of section 215 were designed to limit the anticompetitive potential of carrier-supplier contracts and practices. The fact that these prior versions were not enacted represents, at most, a congressional determination to leave antitrust enforcement to the Justice Department, and certainly does not reveal some sort of inchoate limitation on the FCC's power to control the equipment attached by carriers to the national network. The fact that the FCC has not previously attempted to control directly the carriers' equipment does not mean that the Commission has interpreted the Act to deny it jurisdiction over carrier equipment. Even if the principle that an agency's construction of its enabling statute is entitled to deference, could be employed to estop an agency from revising its views (a proposition of not inconsiderable difficulty),[22] the principle is inapposite to the facts of this case.
 
 
 53
 Sections 203 through 205 do prescribe a procedure for review and approval of tariffs by carriers, but section 205 itself gives the Commission power to determine and set just and reasonable charges and practices if it finds present tariffs to be unreasonable. The FCC may not exercise this authority unless it first provides interested parties "full opportunity for hearing," see 47 U.S.C.A. § 205(a), but there is no contention that this requirement has not been met in this case. Thus, the instant case is not governed by the holding of the United States Court of Appeals for the Second Circuit that the FCC could not require AT&T to obtain its approval before filing a carrier-initiated rate revision. See AT&T Co. v. FCC, 487 F.2d 865 (2d Cir. 1973). That case was based on the holding that the prior approval scheme contravened the express procedural dictates of sections 203 and 204. The FCC's registration program, however, has been established under section 205 authority and in no way attempts to alter the procedure by which carriers file tariffs under sections 203 and 204.
 
 
 54
 V. EXERCISE OF POWER: CONSIDERATIONS OF ECONOMIC IMPACT
 
 
 55
 We have reaffirmed our decision in North Carolina I that the Communications Act grants the FCC, rather than the states, primary authority over terminal equipment used for both interstate and local communication (Part III, supra ). We have determined that the powers delegated to the Commission by the Act include the power to establish a registration program for all terminal equipment (Part IV, supra ). We turn now to petitioners' third claim that the FCC, even if it should be held to have the jurisdictional competence and the statutory authority to adopt a registration program for joint terminal equipment, has failed to exercise that power in a lawful manner.
 
 
 56
 Petitioners make two main objections. First, they claim that the FCC erroneously concluded that the public benefits of interconnection under a registration program would be greater than the cost of the registration program. Second, petitioners contend that the FCC neglected to consider the economic impact of its registration program, and that such an evaluation must be completed before the registration program can be put into effect.
 
 
 57
 A. Program Cost. Our inquiry here focuses on the cost of the registration program itself, i.e., the cost to carriers and independent manufacturers of complying with the program's administrative requirements. We do not, at this point, address the program's economic impact on carrier revenue sources.
 
 
 58
 At first glance, petitioners' position appears to be that the FCC incorrectly estimated the cost of compliance with its registration program. Yet petitioners point to no evidentiary irregularities or omissions that flawed the Commission's deliberations. What petitioners actually attack is the FCC's judgment that the costs of the program will be "minimal," First Report P 20 & n.10; see also Second Report PP 12-13, and the FCC's conclusion that the public benefits of liberalized interconnection under a registration program will exceed the costs of implementing and complying with that program. First Report P 16.
 
 
 59
 Petitioners emphasize the projected costs of registration, but this misapprehends the office of judicial review of agency action. The absolute cost of a registration program does not determine its lawfulness. To be sure, the registration program involves expenses which terminal equipment manufacturers currently avoid, but increased expenses inevitably accompany any regulation of industry. The question for the Commission is whether the public benefits of a registration program outweigh the costs. The question for the Court is whether the FCC's judgment is supported by substantial evidence.[23]
 
 
 60
 Even if petitioners' protestations about registration costs are fully credited,[24] petitioners suggest no reason to suspect that the Commission's decision was fundamentally defective or not supported by substantial evidence. Indeed, the specifics of the program type registration, simplified registration for equipment currently in use, and grandfathering of almost all carrier equipment should ensure that expense will be held to the minimum consistent with any registration program. If a manufacturer finds registration too burdensome, it can continue the current practice of selling equipment for attachment using carrier-supplied CAs and NCSUs. Moreover, the record shows that, in response to carrier suggestions, the FCC streamlined its registration requirements, thereby reducing the cost of registration (according to carrier figures) by an estimated 250 million dollars.[25] We see no institutional impediment to continued cooperation between the FCC and the carriers to keep registration expenses to a minimum.
 
 
 61
 In designing its registration program, the Commission has fully evaluated petitioners' cost projections. Petitioners' claims amount to no more than a quarrel with the Commission about where the public interest lies. Because petitioners fail to show any defects in the process by which the Commission made its decision, it would be a naked assertion of judicial power for this Court to reverse the Commission's determination that the registration program will further the public interest. On this record, there is no warrant for upsetting the Commission's judgment, and we must therefore respect it.
 
 
 62
 B. Economic Impact. Petitioners argue that the registration program will cause significant decreases in carrier revenues as customers purchase independently manufactured terminal equipment rather than renting carrier-supplied equipment. The loss of revenues from terminal equipment, they contend, will in turn force major changes in rates for residential service presently subsidized by prices for terminal equipment which are above unit cost. Petitioners allege that the Commission has not even considered the possible economic impact of its registration program, and that an extensive analysis of economic impact must be completed before the program can lawfully be put into effect.
 
 
 63
 1. A Perspective on Controversy. A fundamental error infects petitioners' analysis of economic impact: they confuse the economic impact of the interconnection policy, which has been in effect since 1969, with the economic impact of the registration program. Since 1969, carrier-filed tariffs have permitted all subscribers to purchase any type of terminal equipment from independent manufacturers and attach that equipment to the telephone line, as long as the carrier-supplied CAs and NCSUs are employed.[26] The only difference between the registration program and the current tariffs is that under the program customers will be permitted to attach registered terminal equipment without paying the carriers for CAs and NCSUs.[27]
 
 
 64
 Petitioners do not challenge the legality of the FCC's interconnection policy, and apparently they do not contend that the current carrier-filed "connecting arrangement" tariffs must be suspended while an in-depth study of their economic impact is completed. Therefore, in assessing the economic impact of the registration program, we must focus on the economic effects of the elimination of CAs and NCSUs only.
 
 
 65
 2. Revenue Losses. The contention that elimination of CAs and NSCUs will cause direct revenue losses is unfounded. The carriers have consistently maintained that prices currently charged for CAs and NCSUs no more than recoup their costs of providing the intermediary devices.[28] Thus, if the intermediary devices were eliminated, the carriers would suffer no net decline in revenues, according to their own figures. Nor would the carriers' ability to compete with independent sellers of terminal equipment be directly impaired by elimination of the intermediary devices: since these devices are currently priced at cost, they provide no excess revenue to underwrite competition in terminal equipment. In short, elimination of CAs and NCSUs will have no different direct economic impact than the present "connecting arrangement" tariffs.
 
 
 66
 It might be argued, however, that elimination of CAs and NCSUs will indirectly reduce carrier revenues because independent terminal equipment can be purchased and used at a lower cost to the customer under the registration program. That is, the customer will no longer have to pay the price of the terminal equipment plus the cost of the intermediary devices, and carriers will face the unpleasant alternative of either losing sales or lowering prices on terminal equipment.
 
 
 67
 Two difficulties beset this argument. First, it makes the illogical assumption that independents can manufacture equipment that will perform the functions currently performed by CAs and NCSUs (a precondition for registration) without a commensurate increase in costs.[29] Second, it postulates a kind of price-sensitive competition that petitioners' own facts belie. Petitioners tell us that they presently overcharge on sophisticated terminal equipment in order to subsidize residential service, yet they are unable to show that, under the interconnection policy in effect since 1969, this practice has resulted in diminished sales of terminal equipment. The logical conclusion is that even if increases in independents' costs (and prices) do not equal the price of CAs and NCSUs, the registration program can hardly be expected to cause a significant "substitution effect." Should independents choose to cut prices or engage in significant nonprice competition, any economic impact from such tactics would properly be attributed to the interconnection policy which ended the carriers' monopoly over terminal equipment, and not to the registration program.
 
 
 68
 C. The Necessity for Prior Economic Analysis. Petitioners insist that the Commission must make a thorough study of all possible economic impacts before the program can be put into effect. We hold that the statutory prerequisites for FCC action have been met, and reject petitioners' attempt to characterize the Commission's position as a refusal even to consider potential economic impact.
 
 
 69
 Contrary to petitioners' assertions, no general principle of administrative law forces all agencies to conduct exhaustive economic impact studies before taking action. Such a requirement would hamstring administration at every juncture of the policy making and implementation process. Rather, the prerequisites for agency action as a fair reading of the cases cited by petitioners reveals are enumerated by each agency's enabling statute.
 
 
 70
 Section 205(a) of the Communications Act, 47 U.S.C.A. 205(a) (1962), provides:
 
 
 71
 "Whenever, after full opportunity for hearing . . . the Commission shall be of opinion that any charge, classification, regulation or practice of any carrier or carriers is or will be in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge . . . and what classification, regulation, or practice is or will be just, fair and reasonable, to be thereafter followed . . . ."
 
 
 72
 The unreasonableness and discriminatory effect (in violation of sections 203 and 204) of the present "connecting arrangement" tariff is established and is not challenged on this appeal. Therefore, all explicit statutory prerequisites for Commission action to prescribe carrier practices have been fulfilled.
 
 
 73
 We would be remiss, however, if we permitted the FCC to implement a registration program that would have major effects on rates paid by telephone subscribers without even considering that potential economic impact. The purpose of the Communications Act to establish "a rapid, efficient, Nationwide and world-wide wire and radio communication service with adequate facilities at reasonable charges," 47 U.S.C.A. § 151 (1962) would be undercut if the Commission could adopt "technical" requirements without making a preliminary reasoned assessment of their economic impact. On the other hand, section 151 would be equally frustrated if the Commission were barred from acting unless it first performs an in-depth economic analysis of every decision it must make and every program it adopts.
 
 
 74
 We reject, as inconsistent with section 205, petitioners' contention that the Commission must complete a full-scale economic inquiry before implementing its registration program. While the Communications Act secures a major role for carriers in the filing of binding tariffs, see 47 U.S.C.A. §§ 203-204 (1962), section 205 clearly permits the Commission to prescribe carrier practices and regulations when carrier-filed tariffs are determined to be in violation of the substantive requirements of the Act. Petitioners' argument not only ignores this express authority granted by section 205 to the FCC, but would produce the anomalous result that an admittedly illegal carrier-filed tariff would remain in effect pending completion of an economic inquiry concerning a presumptively legal FCC regulation.
 
 
 75
 Nor can we subscribe to petitioners' claim that the Commission has refused to consider the economic impact of the registration program. The Commission has consistently maintained that the registration program will have an economic impact that is not substantially different from the impact of the present "connecting arrangement" tariffs. Consequently, the Commission views Docket 19528 as limited to the "technical" aspects of registration, although it continues to investigate the long-term economic impact of the interconnection policy in Docket 20003.[30]
 
 
 76
 If the registration program posed a major threat to carrier revenues, the Commission, of course, could not blink reality and assume the impact away. But it is equally true that petitioners cannot create an economic impact with the volume of their jeremiad. Their claims of economic impact are refrains of assertions that the FCC has consistently found to be unsubstantiated by evidence, conclusory, and based on unrealistic assumptions about market behavior. See Carterphone, 14 F.C.C.2d at 573 & n. 3; Notice of Inquiry in Docket 2003, 46 F.C.C.2d 214; Customer Interconnection, 49 F.C.C.2d 1238, 1239. Our own analysis of the potential impact of the registration program, see part VB, supra, satisfies us that the Commission's operational assumption that replacing CAs and NCSUs with a registration system will have minimal economic impact, is sound. We can discover no statutory requirement that compels the Commission to test this assumption in time-consuming additional proceedings.
 
 
 77
 We repeat that the Commission has not denied its responsibility to consider the economic impact of its registration program. What the FCC has done is to make reasonable assumptions about economic impact based on the evidence currently available. The Commission's recognition of its responsibility to consider economic impact is evidenced by its announced policy of granting appropriate relief to carriers who can show injury from liberalized interconnection. In Mebane Home Telephone Co., 53 F.C.C.2d 473, 480 (1975), the FCC provided that restraints on interconnection will be authorized whenever a carrier files a petition and demonstrates that "compliance with the obligation . . . has already resulted in or will result in direct, substantial and immediate economic injury to (the) telephone system and detriment to the public interest." (Emphasis added.)
 
 
 78
 This exemption from the FCC's interconnection policy and the proposed registration program seems adequate protection for the carriers as institutions, and for the public interest if it be implicated by any substitution effect. To further delay effectuation of the registration program would be an excess of caution. This is particularly true in the circumstances of this case, where the alternative to permitting the FCC's program to go into effect is to allow the carriers to continue to operate under their "connecting arrangement" tariffs which are themselves unlawful.
 
 
 79
 The Commission's First Report and Order in Docket No. 19528, 56 F.C.C.2d 593 (1975); its Second Report and Order in Docket No. 19528, 58 F.C.C.2d 736 (1976), and its Memorandum Opinion and Orders released February 13, 1976, March 15, 1976, and April 28, 1976, are affirmed.
 
 WIDENER, Circuit Judge, dissenting:
 
 80
 I am respectfully unable to join in the opinion of the court,[1] which in my view evinces an impressive lack of concern for the ordinary home telephone subscribing public those who bear the risk of ultimately paying for their newly-acquired right of unrestricted interconnection in the form of higher rates for telephone service.
 
 
 81
 As a preliminary matter, I indicated in my dissent in North Carolina I my belief that the FCC's adventure into the regulation of terminal equipment interconnection encroaches upon the regulatory sphere reserved by Congress to the States. I continue to adhere to the jurisdictional views I expressed in that case, and would set aside the Commission's orders on that ground alone. See 537 F.2d at 796. I am unable to refrain from repeating the admonition I expressed in my prior dissent that, "Depriving the States of jurisdiction deprives them of the right to regulate, which in turn deprives them of the right to distribute the burden of telephone service among the various classes of customers." 537 F.2d at 799.
 
 
 82
 Jurisdiction aside, however, I cannot accept the court's upholding of this all-embracing regulatory scheme in light of the Commission's stout refusal to conduct a reasoned inquiry into the economic implications of both unrestricted customer interconnection and the inclusion of carrier equipment in the registration program. I view the absence of such an inquiry as nothing less than a refusal by the FCC to consider pertinent evidence proffered by petitioners, see Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924); S. D. Warren Co. v. NLRB, 342 F.2d 814 (1st Cir. 1965), cert. den., 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300 (1966), which should require us to hold the Commission's action arbitrary, capricious, and an abuse of discretion.[2] 5 U.S.C.s 706(2)(A).
 
 
 83
 The majority characterizes this case as merely a dispute between petitioners and the FCC as to where the public interest lies, based upon a balancing of interests. With due respect, I think the posture of the case is misconceived. The fault lies not only in the fact that such regulatory action was taken, but at least equally in the fact that administrative judgment was reached with utter disregard of evidence pertinent to the public interest.
 
 
 84
 This court, let alone the petitioners, of course is not entitled to impose its policy judgments in place of those properly arrived at by the Commission. But we abdicate our responsibility as a reviewing court when we fail to insist that regulatory action, once taken, results from a process of fair, reasoned decisionmaking. International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. den., 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). To that end, basic principles of administrative law have evolved that require such agencies as the FCC to make necessary supportive findings of fact, Saginaw Broadcasting Co. v. FCC, 68 App.D.C. 282, 96 F.2d 554 (1938), cert. den., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938), and to "articulate with reasonable clarity its reasons for decision, and identify the significance of crucial facts." Greater Boston, at 851.
 
 
 85
 Here, while the grounds upon which the Commission acted are not left to our speculation, and we are advised as to the facts before the Commission when it acted, both are manifestly inadequate to support the far-reaching regulatory action taken. Gulf States Utilities Co. v. FPC, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); see SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The serious and thus far unrefuted claims of adverse economic effect advanced by the petitioners, the Commission's fundamental statutory obligation to oversee the provision of communication services at reasonable charges to "all the people of the United States,"[3] and the equally basic duty of an agency to consider all pertinent public interest factors properly before it in exercising its rulemaking or adjudicatory functions,[4] dictate that the FCC be required to conduct an inquiry into potential impact on telephone rates to the public prior to embarking on this expensive, risky, uncertain, and largely irreversible course. There is a certain irony apparent when one realizes that this entire regulatory scheme was ostensibly designed to foster the right of the public to enjoy freer interconnection of privately manufactured facilities, while at the same time it is almost wholly the same public, rather than a relatively small number of equipment manufacturers and large scale business subscribers, that is forced to assume the risk of a correct economic forecast on the part of the carriers.
 
 
 86
 The cavalier attitude of the FCC throughout both these cases is accurately shown by the passage in its brief in opposition to a stay in this case (p. 24):
 
 
 87
 "In short, it is the carriers' customers, not the carriers, who will pay for whatever expenses the carriers may incur in conforming to the equipment registration program."
 
 
 88
 * FCC's FAILURE TO CONSIDER ECONOMIC IMPACT
 
 A. Impact of Customer Substitution
 
 89
 The projections of economic cost flowing from liberalized interconnection submitted by petitioners to the FCC are not insignificant; one study by the National Association of Regulatory Utility Commissioners estimated the cost to consumers at 360-740 million dollars yearly by 1980. In addition, the Bell system estimates its direct registration costs at 94 million dollars in the first year alone, an estimate that stands unrefuted, and which alone should give us pause. While I cannot vouch for the accuracy of these figures, a task better suited to the expertise of the FCC, they are not shown to be irresponsible and the distinct possibility that they may be accurate convinces me that an agency concerned with the public interest cannot afford to ignore them as is done here. And contrary to the majority's assertions that the Commission has considered all relevant cost data, it is at once apparent that it has not. Indeed, the Commission admits that its Docket 19528 proceeding was concerned solely with issues of technical harm to the telephone network. Second Report and Order in Docket 19528, P 12.
 
 
 90
 Underlying the cost data analyses of the Commission is the myopic assumption that the costs associated with widespread customer interconnection have nothing to do with this case.[5] I could not more strongly disagree. Never, from Carterphone's abstract assertion of the right of customer interconnection until the present proceeding, has a telephone subscriber been accorded a right of virtually unrestricted interconnection of his own equipment. Under post-Carterphone tariffs he has had the ability to interconnect only through the medium of protective circuitry provided by the carriers. In these circumstances, it is not surprising that carriers have not suffered revenue losses from interconnection up to now. It is difficult to conceive why a telephone customer would incur the expense of buying his own 'phone, only to be required to rent protective circuitry from the telephone company at an added expense that would be unnecessary if he had rented a carrier telephone in the first place. The Commission is undoubtedly correct when it concludes that the present tariffs are restrictive of interconnection; what it fails to show is how at the same time it can seriously insist that the elimination of that restriction portends nothing in terms of lost revenues from interconnection.[6]
 
 
 91
 It is also worth noting in this connection that the FCC has never been asked by a party to this proceeding to duplicate any inquiry that had previously been undertaken in Carterphone. For Carterphone itself, despite its broad declaration of policy, never purported to examine the economic implications of that policy. Indeed, there was no necessity of doing so in that case, which had nothing whatever to do with customer substitution of equipment traditionally supplied by telephone carriers. The extension of the Carterphone policy into the substitution area awaited the Mebane decision, in which the Commission again failed to take stock of the likely effect of its policy on telephone rates. Rather, carriers were offered the after-the-fact opportunity, today approved by this court, of exempting themselves by demonstrating the threat of "substantial and immediate economic injury to (the) telephone system and detriment to the public interest." 53 F.C.C.2d 473, 480 (1975). I do not approve of this procedure, which for all practical purposes constitutes an unlawful delegation of responsibility for safeguarding the public interest from the FCC, where it properly belongs, to private carriers, whose interests will not always coincide with those of the public.
 
 
 92
 Had the FCC taken concrete steps to implement widespread customer substitution in Carterphone, as it had done here, the omission of an economic inquiry would have called into question the validity of its action at that time. That the Commission waited eight years before taking such steps does not relieve it of its basic obligation to consider fully all evidence bearing on the public interest in advance of taking regulatory action. The fulfillment of that obligation is what this case is about. A disinclination by the FCC, approved by the majority here, to "revisit Carterphone " simply misses the point.
 
 B. Direct Carrier Registration Costs
 
 93
 So far I have focused on the failure of the FCC to consider the long term economic implications of interconnection in conjunction with its Docket 19528 proceeding, and have demonstrated how that failure violated the Commission's obligation to arrive at reasoned conclusions based on consideration of all factors pertinent to the public interest. Even if the costs associated with interconnection were not relevant to this proceeding, however, I would still be impelled to apply much of the preceding discussion to the direct costs of carrier compliance with the registration program, and to set aside the orders under review, insofar as carrier equipment is included, because of the FCC's failure to consider evidence bearing on those costs.
 
 
 94
 It is quite obvious that the Commission relied upon assumptions, which it made absolutely no effort to support, that the program would be "relatively inexpensive and easy to implement." FCC Memorandum Opinion and Order in Docket 19528, 57 F.C.C.2d 1217 (1976). This assumption was made in the face of the Bell system's projection that inclusion of carrier equipment would impose costs in the first year alone of 300 million dollars. While this estimate was later revised to the not inconsiderable sum of 94 million dollars to reflect alterations in the program, the FCC never addressed itself to any of these figures, even to refute them.
 
 
 95
 I hasten to add once again that the reliability of these cost projections, whatever the extent of their logical or empirical support, is ordinarily not for the court to evaluate. It is, however, the duty of the FCC to make such an evaluation, and to do so in advance of committing carriers to multi-million dollar expenditures that are certain to be passed on to the public. If the Commission had done so, it would now be in the position that the majority see it in able to exercise its considered judgment and expertise in evaluating where the public interest lies a judgment we should be hesitant to disturb. Udall v. Tallman, 380 U.S. 1, esp. 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 II
 
 96
 INCLUSION OF CARRIER EQUIPMENT AND THE PLUG AND JACK REQUIREMENT
 
 
 97
 I regard the inclusion of carrier equipment in the registration scheme, as well as the requirement that all items of registered equipment, with the apparent exception of PBX and key telephone equipment, be connected through the use of standard plugs and jacks,[7] defective for a reason related to, but distinct from, the economic considerations previously addressed. It is altogether plain what purpose these provisions are intended to serve the promotion of competition in the terminal equipment market. Of course, this is the purpose of all the action taken by the FCC in Docket 19528; even a cursory examination of all the FCC briefs admits of no other conclusion. But while the setting of quality standards for equipment produced by unregulated manufacturers to be plugged directly into the telephone network for the first time is arguably a matter that demanded FCC attention[8] to ensure the safety of telephone company equipment and personnel, no such justification exists with respect to the carriers' own equipment. Carrier equipment has been connected to telephone lines since before the creation of the FCC in 1934, indeed for about a hundred years in all, and no reason is offered by the Commission for its sudden concern with the "potential" of that equipment to pose danger to the telephone network. The only possible rationale for registration of carrier equipment was well expressed by the Commission itself:
 
 
 98
 "Furthermore, when one participant in a competitive market is subject to regulatory constraints (e. g. registration of equipment) while another is not, there exists the possibility of using the registration, notification and complaint standards and procedures for competitive advantage." FCC First Report and Order in Docket 19528, P 20.
 
 
 99
 It is similarly apparent that the purpose of the standard plug and jack requirement is to facilitate the ability of telephone subscribers to substitute independently manufactured equipment for that supplied by the carriers, thus stimulating competition in the equipment market.
 
 
 100
 The thrust of my objection is again largely procedural, although not wholly. Whether competition in terminal equipment is in the public interest is a question that, at the very least, must be resolved with specific findings by the FCC, not on the basis of assumptions drawn from unregulated sectors of the economy, which do not necessarily retain their vitality in the regulatory context. FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); Hawaiian Telephone Co. v. FCC, 162 U.S.App.D.C. 229, 498 F.2d 771 (1974). But it is obvious here, since the Commission made no findings of how, why, or if, competition will benefit the public, even to the extent of not determining whether competition will result in higher or lower prices for telephone service, that it has regarded the relative positions of competitors as of paramount significance, rather than efficient service at reasonable rates to "all the people of the United States," as is its statutory obligation. This overpowering concern with competition to the exclusion of other public interest, of course, is a fundamental error of judgment on the part of the FCC, Hawaiian Telephone Co., supra, especially when it may be in conflict with the statutory definition of the public interest as set out in 47 U.S.C. § 151.
 
 
 101
 On a more basic level, and what I now say applies in large extent to the whole case, the fundamental issue involved here may well require resolution by Congress, rather than the FCC, for Congress has determined that the public interest is better served in the field of telephone service by a regulated monopoly than by competition. See RCA, supra. The real issue this case resolves itself into is what the scope of that regulated monopoly is to be. Regardless of whether the production of terminal equipment is characterized by the same high fixed costs and economies of scale, indicative of a "natural monopoly," as is the construction of a telephone line network, Congress has prescribed a scheme of regulation that has traditionally included largely carrier-supplied terminal equipment. I believe it is ultimately for Congress to determine the extent to which direct regulation is to be supplanted by regulation through the forces of free competition.[9]
 
 
 102
 For these reasons, I would set aside the Commission's orders to the extent that they include carrier equipment. And I would retain the stay we earlier imposed upon the remainder of the registration program until such time as the Commission, on remand, makes an effort to gauge the economic impact of a regulatory regime that is likely for the first time truly to facilitate widespread customer substitution of equipment traditionally supplied by telephone carriers.
 
 III
 
 103
 Once again for emphasis, it is the obligation of the FCC to see that telephone service to all at reasonable rates is provided. It is not its principal obligation to see that equipment manufacturers compete for the equipment market with the carriers. If such competition is for the advantage of the ordinary telephone subscriber, then who can gainsay it is not good public policy; but if not for such advantage, can it be said that the public interest is served?[10] The FCC has made a decision that will almost immediately affect the rates of practically every telephone subscriber in the nation without the remotest reasoned idea of how the total cost for telephone service will be affected.[11] I think this conduct quite irresponsible, not to mention arbitrary, capricious, an abuse of discretion, and not in accordance with law.
 
 
 
 *
 Honorable Richard T. Rives, Honorable Elbert P. Tuttle, Senior United States Circuit Judges, Fifth Circuit, sitting by designation
 
 
 [1]
 Paragraph 2.6.1 of tariff FCC No. 263 provided: "No equipment, apparatus, circuit or device not furnished by the telephone company shall be attached to or connected with the facilities furnished by the telephone company, whether physically, by induction or otherwise. . . ." See Carterphone v. AT&T, 13 F.C.C.2d 420, 427 & nn. 6-7 (1968)
 
 
 [2]
 The Commission held that: "(T)he tariff is unreasonable in that it prohibits the use of interconnecting devices which do not adversely affect the telephone system. . . . (O)ur own conclusion here is that a customer desiring to use an interconnecting device to improve the utility to him of both the telephone system and a private radio system should be able to do so, so long as the interconnection does not adversely affect the telephone company's operations or the telephone system's utility for others. A tariff which prevents this is unreasonable; it is also unduly discriminatory when, as here, the telephone company's own interconnecting equipment is approved for use. The vice of this present tariff . . . is that it prohibits the use of harmless as well as harmful devices."
 
 
 [13]
 F.C.C.2d at 523-24
 
 
 [3]
 The Commission clearly held, however, that its Carterphone decision established an interconnection policy embracing other types of terminal equipment: "In view of the unlawfulness of the tariff there would be no point in merely declaring it invalid as applied to the Carterphone and permitting it to continue in operation as to other interconnection devices. This would also put a clearly improper burden upon the manufacturers and users of other devices. The appropriate remedy is to strike the tariff and permit the carriers, if they so desire, to propose new tariff provisions in accordance with this opinion."
 
 
 [13]
 F.C.C.2d at 425
 
 
 [4]
 Section 403 of the Communications Act, 47 U.S.C.A. § 403, gives the FCC "full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter . . . concerning which complaint is authorized to be made, to or before the Commission by any provision of this chapter. . . ." Section 208, 47 U.S.C.A. § 208, provides that any "person, any body politic or municipal organization, or State commission" may complain to or file a complaint with the Commission relating to "anything done or omitted to be done by any common carrier subject to this chapter, in contravention of the provisions thereof . . . ." Cf. ICC v. Inland Waterways Corp., 319 U.S. 671, 63 S.Ct. 1296, 87 L.Ed. 1655 (1943) (no bar to finding of unlawfulness that tariff has been permitted to remain in effect)
 
 
 [5]
 E. g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)
 
 
 [6]
 Docket 20003 deals with the broad policy and economic implications of liberalized interconnection, rather than the relatively limited economic impact of the registration program. See Part VB infra. Hence we have no occasion to consider the accuracy of or the evidentiary support for the Commission's First Report in Docket 20003
 
 
 [7]
 Approximately 97% of telephone calls are intrastate, In Re Telerent Leasing Corp., 45 F.C.C.2d 204, 211 (1974), a percentage that has apparently remained stable since the passage of the Communications Act, see 78 CONG. REC. 10316 (1934) ("97 1/2 or 98% of all telephone calls" are intrastate). About 25 per cent of all "toll," i.e., long distance, calls are intrastate calls. See Use of Recording Devices, 11 F.C.C. 1033, 1048 (1947)
 
 
 [8]
 Ordinarily one panel of the Court does not overrule another, see Local No. 358, Bakery & Confectionery Workers Unions v. Nolde Bros., Inc., 530 F.2d 548, 557 (4th Cir. 1975) (Widener, J., concurring and dissenting), even though the second panel might have reached a different result on the merits, cf. United States v. Bailey, 468 F.2d 652, 669 (5th Cir.), aff'd en banc, 480 F.2d 518 (5th Cir. 1973) (reluctantly following prior panel). It is the Court en banc that normally reconsiders the rulings of any particular panel. See Hales v. Winn-Dixie Stores, Inc., 500 F.2d 836, 853 (4th Cir. 1974) (Widener, J., dissenting)
 
 
 [9]
 E. g., United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); Co-operative Grain & Supply Co. v. Commissioner of Internal Revenue, 407 F.2d 1158, 1162 (8th Cir. 1969); Donaldson, Hoffman & Goldstein v. Gaudio, 260 F.2d 333, 336 (10th Cir. 1958)
 
 
 [10]
 See H. M. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1412 (tent. ed. 1958)
 
 
 [11]
 Hush-A-Phone Corp. v. AT&T, 22 F.C.C. 112 (1957), on remand from Hush-A-Phone v. United States, 99 U.S.App.D.C. 190, 238 F.2d 266 (1956)
 
 
 [12]
 Carterphone, 13 F.C.C.2d 420 (1968), reconsideration denied 14 F.C.C.2d 571 (1968)
 
 
 [13]
 In Use of Recording Devices, 11 F.C.C. 1033 (1947), the Bell System contended that the practical impossibility of separating interstate and intrastate uses of recorders attached to the telephone network created a situation where "any order of the Commission requiring that the telephone companies permit, prohibit, or restrict the use of recording devices in connection with interstate toll service would affect intrastate service." The Bell System further maintained that by virtue of sections 2(b)(1) and 221(b) "the jurisdiction of the Commission to make an order regulating the use of recorders is limited to use in connection with facilities which are exclusively intrastate," 11 F.C.C. at 1046. The Commission rejected Bell's argument:
 " . . . It may be commented further, however, that the Bell System argument ignores the real consideration that interstate and foreign message toll telephone service requires the use of facilities that are not 'exclusively interstate.' This service necessarily involves all the facilities, charges, classifications, practices, services and regulations used in the rendition of the service, and regulation of such service must be able to deal with all or any of the matters so involved if it is to be effective."
 
 
 [11]
 F.C.C. at 1047
 
 
 [14]
 In Jordaphone Corp. v. AT&T, 18 F.C.C. 644 (1954), the Commission categorically rejected the contention that it did not have jurisdiction to decide whether the defendant telephone companies should be ordered to permit interconnection of answering devices. 18 F.C.C. at 670. On the merits, however, the FCC concluded that the proponents of the proposed order had failed to show a sufficient need for FCC action
 
 
 [15]
 See AT&T-TWX, 38 F.C.C. 1127, 1133 (1965) ("for us to conclude that, because the facilities or instrumentalities are used in intrastate as well as interstate communications service, we do not have jurisdiction . . . would leave a substantial portion of the interstate communication service unregulated. We do not believe the Congress so intended.")
 
 
 [16]
 See AT&T (Railroad Interconnection), 32 F.C.C. 337, 339 (1962)
 
 
 [17]
 In Katz v. AT&T Co., 43 F.C.C. 1328, 1332 (1952), the Commission "flatly rejected" the argument that it lacked jurisdiction to act "where both interstate and intrastate telephone facilities were involved," and commented:
 "The fact that the same instruments are used for both interstate and intrastate services . . . does not alter the Commission's duties and obligations with respect to interstate telephone facilities. Were the Commission to exercise its jurisdiction only where the telephone facilities in question were exclusive interstate in character, it would result in virtually complete abdication from the field of telephone regulation by the Commission."
 
 
 [18]
 See Dept. of Defense v. General Telephone Co., 38 F.C.C.2d 803, 807-12 (1973), review denied, FCC 73-854 (1973), aff'd per curiam sub nom. St. Joseph Tel. & Tel. Co. v. FCC, 164 U.S.App.D.C. 369, 505 F.2d 476 (1974)
 
 
 [19]
 See, e.g., AT & S Foreign Attachment Tariff Revisions, 15 F.C.C.2d 605, 607 (1968)
 
 
 [20]
 E.g., National Broadcasting Co. v. United States, 319 U.S. 190, 218-19, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (FCC power to take action not explicitly authorized by Communications Act upheld; "itemized catalogue" of specific problems and powers of a regulatory agency would "frustrate the purposes for which the Communications Act" was passed; GTE Service Corp. v. FCC, 474 F.2d 724, 730-31 (2d Cir.1973) (fact that Communications Act makes no reference to computers and data processing does not prohibit FCC from regulating carrier activities in those fields); Mt. Mansfield Television, Inc. v. FCC, 442 F.2d 470, 480-81 (2d Cir.1971) (FCC may regulate prime time access in television despite lack of specific statutory authorization)
 
 
 [21]
 E.g., American Trucking Assocs., Inc. v. United States, 344 U.S. 298, 309-10, 73 S.Ct. 307, 97 L.Ed. 337 (1953)
 
 
 [22]
 See Part IIIE supra
 
 
 [23]
 See 5 U.S.C. § 706(2)(E)
 
 
 [24]
 The Bell System alone originally estimated its cost of compliance at $350 million, see Memorandum Opinion and Order, Docket 19528, February 13, 1976, 57 F.C.C.2d 1216, 1225-26 (1976) (A. 1722-23). That estimate has been revised, due to changes in the nature of the registration program and to the "grandfathering" of carrier equipment, to $94 million for the first year of the registration program, see Brief for Petitioners at 98-99 & nn. 137-138. The FCC found that the first estimate was "unsupported either by affidavit or explanation," and expressed its doubt that "an unsupported estimate of cost by a party which has consistently opposed any registration program provides an adequate basis for further delay." Memorandum Opinion and Order, 57 F.C.C.2d 1216 (1976) (A. 1723). The current estimate is supported by affidavit only, and is conspicuously lacking in hard data on cost breakdown or itemization
 
 
 [25]
 See Brief for Petitioners at 98-99 & nn. 137-38
 
 
 [26]
 "Since 1968, customers have been afforded the right pursuant to Hush-A-Phone and Carterphone to provide their own terminal equipment of all types, and independent manufacturers and distributors have been afforded the opportunity to supply such equipment to the public in competition with the vertically integrated telephone industry." Second Report and Order P 7 (March 18, 1976)
 
 
 [27]
 As the Commission stated in its Notice of Inquiry that formally began Docket 19528: "it is not our intention to consider in this proceeding any question as to whether there should be any modification of our holding in Carterphone. . . . We believe the soundness of our Carterphone decision has been amply demonstrated. . . . Our proceeding herein is concerned with . . . whether . . . there is a public need for us to . . . permit customers to provide (their own) NCSU's and CA's in interstate" communications. 35 F.C.C.2d at 542 (1972)
 
 
 [28]
 "These connecting arrangements . . . were never alleged to be necessary as an anti-competitive deterrent to the purchase of non-carrier equipment. Nor were they alleged to be necessary as a surcharge needed to produce revenue 'contribution' to the telephone companies. Rather they were alleged to be necessary solely to protect the nation's telephone network from any technical harms which non-carrier terminals might produce." Second Report and Order P 14 (March 18, 1976)
 
 
 [29]
 One independent manufacturer has claimed that its redesign costs alone could "well amount to $500,000" under the registration program
 
 
 [30]
 Thus, in its First Report and Order, the Commission clearly and correctly limited Docket 19528 to consideration of the impact of the registration program rather than the interconnection policy:
 "Our Carterphone policy has permitted the public to utilize various types of equipment with the public communications network. It is our firm belief that public benefits have resulted from this policy. The purpose of Docket 19528 is not to revisit Carterphone but rather to review the present limitations imposed on the attachment of equipment to this network. . . . The potential economic consequences of any decision in this proceeding are minimal, since they affect only the differential costs and revenues associated with customer-provided vis-a-vis carrier-provided protective circuitry and procedures not with the terminal device per se."
 First Report and Order P 19 n.10.
 
 
 [1]
 I do not disagree that this panel has the right to reexamine a holding of a previous panel when in both cases en banc consideration is precluded because of the disqualifications. Otherwise, many subjects would be relatively frozen
 
 
 [2]
 The Administrative Procedure Act does not specify a particular standard of review applicable to informal rule-making proceedings such as that conducted by the FCC in this case, which considered written comments only. Nevertheless, the "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" standard of § 706(2)(A) has generally been assumed to apply. See generally, Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185, 206 (1974). The substantial evidence standard invoked by the majority has been viewed as particularly ill-suited in the informal rule-making context. Id
 
 
 [3]
 47 U.S.C. § 151
 
 
 [4]
 Permian Basin Area Rate Cases, 390 U.S. 747, 791-92, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); see Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)
 
 
 [5]
 "The purpose of Docket 19528 is not to revisit Carterphone but rather to review the present limitations imposed on the attachment of equipment to this network. Thus, issues relating to the potential overall economic impact of the Carterphone policy are beyond the scope of this proceeding." FCC First Report and Order in Docket 19528, P 19 n.10
 
 
 [6]
 "The potential economic impact of any decision in this proceeding are minimal, since they affect only the differential costs and revenues associated with customer-provided vis-a-vis carrier-provided protective circuitry and procedures not with the terminal device per se." Id
 With respect to direct protective circuitry revenue losses, the extent of such losses, or whether they exist at all, would be an appropriate concern of the FCC on remand. Suffice to say at present that I find no admission, as asserted by the majority, by petitioners in the tape of oral argument that prices charged for such circuitry no more than recoup the costs of providing them.
 
 
 [7]
 See 47 CFR § 68.104 (1976). The FCC's Memorandum Opinion and Order in Docket 19528 of April 28, 1976 excepts PBX and key telephone equipment. P 13
 
 
 [8]
 Assuming, of course, jurisdiction to prescribe such direct interconnection, which, in my view, the Commission lacks
 
 
 [9]
 As RCA and Hawaiian Telephone indicate, competition is a factor to be considered, but it may not be considered to be the public interest in itself, when it is, as here, divorced from other public interest factors and absent ". . . ground for reasonable expectation that competition may have some beneficial effect." RCA, 346 U.S. at 97, 73 S.Ct. at 1005
 
 
 [10]
 I generally equate the public interest with improved telephone service, either better, or cheaper, or both. See RCA, both the opinion of the court and the dissent
 
 
 [11]
 The only projections before the Commission point to higher rates